Victor Ross MURRAY, Boatswain's Mate
Second Class, U.S. Navy, Petitioner,

v.

Harold W. HALDEMAN, Jr., Commander,
USN, Military Judge, Respondent.

Misc. Dkt. No. 83–20.

U.S. Court of Military Appeals.

July 25, 1983.

For Petitioner: *Lieutenant Commander·
David S. Durbin,* JAGC, USNR (argued);
*Captain Walter J. Landen, Sr.,* JAGC, USN,
*Lieutenant Commander Richard K. Delmar,*
JAGC, USNR (on brief); *Lieutenant Victo-
ria C. Gilner,* JAGC, USNR (on petition).

For Respondent: *Lieutenant W. David Paxton,* JAGC, USNR (argued); *Commander W.J. Hughes,* JAGC, USN (on brief).

*Amici Curiae* on behalf of Petitioner: *Captain John V. Sullivan* (argued); *Colonel George R. Stevens* (on brief)—For Appellate Defense Division, USAF; *Eugene R. Fidell,* Esquire (argued); *Arthur B. Spitzer,* Esquire (on brief); *Charles S. Sims,* Esquire (of counsel)—For American Civil Liberties Union Foundation; *Peter H. Meyers,* Esquire (argued); *Kevin B. Zeese,* Esquire (on brief)—For The National Organization for the Reform of Marijuana Laws (NORML); *Steven S. Honigman,* Esquire (argued)—For Committee on Military Justice and Military Affairs, The Association of the Bar of the City of New York; *Colonel William G. Eckhardt, Major Robert C. Rhodes, Captain Donna Chapin Maizel, Captain Michael D. Graham* (on brief)—For Defense Appellate Division, USA.

*Amici Curiae* on behalf of Respondent: *Captain Brenda J. Hollis* (argued); *Colonel Kenneth R. Rengert, Major Michael J. Hoover* (on brief)—For Appellate Government Division, USAF; *Captain James C. Underhill, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Major Joseph A. Rehyansky, First Lieutenant Kurt J. Fischer* (on brief)—For Government Appellate Division, USA; *Lieutenant Commander Mark A. O'Hara* (argued); *Lieutenant Christena G. Green* (on brief)—For Appellate Government Division, USCG.

## Opinion of the Court

EVERETT, Chief Judge:

Petitioner applied to our Court for an extraordinary writ to prohibit his prosecution by the Navy on a charge that he "did in the Philadelphia, Pennsylvania area, on or between 5 June 1982 and 6 July 1982, wrongfully use marihuana," in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The charge resulted from the testing of a urine specimen which Murray was compelled to provide upon reporting on July 6, 1982, to a school at the Philadelphia Naval Base.

After the charge had been referred for trial by special court-martial, a pretrial session under Article 39(a), UCMJ, 10 U.S.C. § 839(a), was conducted wherein the military judge received evidence and heard argument on petitioner's claims that the court-martial lacked jurisdiction over the offense and that the urine specimen had been obtained from him unlawfully. In a Memorandum of Decision, the military judge ruled against Murray's contentions, but the trial has been continued to await our decision on the petition for extraordinary relief.

The parties and the various *amici curiae* provided us with extensive briefs which discuss whether the alleged drug use was service-connected and whether the evidence was properly obtained. Thereafter, oral arguments were presented by the parties and *amici* on these same issues. Upon consideration of the record before us and the able briefs and arguments of counsel for the parties and for the *amici curiae,* we have concluded that extraordinary relief should be denied and that the trial should be allowed to proceed.

I

## Factual Background

Sometime before June 1982, Murray, who was then assigned to a ship in the Mediterranean, received orders to report by July 6, 1982, to the Philadelphia Naval Base. There he was to attend an "A" School—Apprentice School—at the Naval Damage Control Training Center (NDCTC), which is subordinate in the chain of command to the Chief of Naval Technical Training and Chief of Naval Education and Training.

Pursuant to orders, Murray arrived in the United States on June 4, 1982, and proceeded promptly to his family's home in Indianapolis, Indiana. From June 5 until July 4, 1982, he remained there in an authorized leave status. On July 4, Murray traveled to Philadelphia, where he remained overnight with a friend in the Philadelphia area. The next day he reported for duty at NDCTC.

Within forty-eight hours of reporting he was ordered to provide a urine sample. He obeyed this order, which had been given to him pursuant to a Navy policy that urine tests be made of persons reporting to an "A" School. Murray was not singled out to provide a urine sample; instead he was required to provide a sample in the same manner as all other persons reporting for instruction at NDCTC.

According to the test, petitioner's urine specimen contained a trace of Delta-9-Tetrahydrocannabinal (THC). The presence of this metabolite of an active ingredient of marihuana would tend to show that Murray had at some prior time ingested or inhaled marihuana.[1] Apparently, the Government's only evidence that Murray had used marihuana was provided by the compulsory urinalysis.

## II

### Criteria for Extraordinary Relief

At the outset, we must consider whether any relief to which petitioner may be entitled should await the review of his case upon direct appeal. We have already made clear elsewhere that not every case is suitable for consideration upon a petition for extraordinary relief—whether by the accused or by the Government. Thus, in United States v. LaBella, 15 M.J. 228 (C.M. A.1983), we reversed the Court of Military Review because we concluded that it had granted a writ of mandamus to the Government in a case for which extraordinary relief was not suited. We noted that such "a drastic remedy . . . should be invoked only in truly extraordinary situations," and we pointed out that "[t]o justify reversal of a discretionary decision by mandamus, the judicial decision must amount to more than even 'gross error'; it must amount 'to a

judicial "usurpation of power,"' United States v. DiStefano, 464 F.2d 845, 850 (2d Cir.1972), or be 'characteristic of an erroneous practice which is likely to recur.'" Id. at 229.

On the other hand, we have not hesitated to consider a petition on the merits when a truly extraordinary situation existed. For example, in Wickham v. Hall, 12 M.J. 145 (C.M.A.1981), a majority of the Court considered on the merits the petition for extraordinary relief of an accused who claimed that her receipt of a discharge precluded her trial by court-martial for alleged fraud in procuring that discharge. In Cooke v. Orser, 12 M.J. 335 (C.M.A.1982), we granted extraordinary relief to a petitioner who claimed that his trial was barred by a promise of immunity. Of course, like the petitioners in Wickham and Cooke, Murray claims that the court-martial is precluded from trying him at all for the offense with which he is charged.[2]

The Supreme Court has allowed bypassing ordinary procedures for review within the military justice system when accused persons have "raised substantial arguments denying the right of the military to try them at all." Noyd v. Bond, 395 U.S. 683, 696 n. 8, 89 S.Ct. 1876, 1884 n. 8, 23 L.Ed.2d 631 (1969). While for some purposes a distinction might be drawn between an issue as to the military status of the accused and an issue as to the service-connection of the offense alleged, see Schlesinger v. Councilman, 420 U.S. 738, 758, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975), we find considerable merit in these comments by Professor Edward H. Cooper, a leading expert on extraordinary remedies, in his address to the 1983 Homer Ferguson Conference:

The policies that limit military tribunals to trial of service-connected offenses, and

1. In some of the briefs, reference is made to "passive inhalation"—the inhalation of smoke from marihuana being smoked by others. Apparently, there is considerable controversy as to the extent to which passive inhalation can cause an appreciable quantity of THC to be present in the urine of the inhaler.

2. Sometimes different rules are applied when the issue is whether a defendant may be tried at all. Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); Menna v. New York, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); United States v. Schaffer, 12 M.J. 425, 428 (C.M.A. 1982).

to jurisdiction over people who in fact are in service, represent vitally important limits that deserve prompt and effective protection. The respective Courts of Military Review and the Court of Military Appeals should not be bashful about using the writs to protect against seeming disregard of these limits.

Apart from the circumstance that Murray has "raised substantial arguments denying the right of the military to try" him, there are other compelling reasons to consider the merits of his petition. In *Shepardson v. Roberts,* 14 M.J. 354 (C.M.A.1983), where the accused sought extraordinary relief to prohibit the Government from repudiating a pretrial agreement, we noted:

> Therefore, in view of the special circumstances of this case, the time and energy that can be conserved here by reviewing promptly the judge's ruling, and the opportunity to resolve promptly some recurrent issues that have now been thoroughly briefed and argued, we believe that it is proper to exercise our extraordinary writ jurisdiction by considering the petition on its merits.

*Id.* at 357 (footnote omitted).

Certainly "time and energy . . . can be conserved here by reviewing promptly the judge's ruling." If Murray's offense is clearly not service-connected or if the evidence obtained by compulsory urinalysis is obviously rendered inadmissible by the exclusionary rule, petitioner can be saved the ordeal of a trial and the parties can avoid the cost of assembling witnesses and presenting evidence. Moreover, the issues raised in this case are "recurrent," and unless we deal with them now, they will inevitably face us in many other cases in the future. Indeed, as we were informed by counsel during oral argument, the trial of several other cases has been delayed to await our decision on Murray's petition.

The questions posed in this Navy case are common to all the Armed Services, for they result from a change of policy of the Department of Defense that occurred on December 28, 1981, when Deputy Secretary of Defense Frank Carlucci issued a Memorandum which allowed evidence obtained by compulsory urinalysis to be used for disciplinary action under the Uniform Code.[3] Thereafter, implementing regulations and directives were promulgated by the various Services, which also have expended substantial sums in providing laboratory testing facilities and in training personnel to perform urinalysis. Thus, the issues raised by Murray have broad ramifications. Moreover, if the military judge here was in error, his rulings were "characteristic of an erroneous practice which is likely to recur." *See United States v. LaBella, supra,* quoting *Daiflon, Inc. v. Bohanon,* 612 F.2d 1249, 1257 (10th Cir.1979), *rev'd.,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

Just as in *Shepardson,* the parties have "thoroughly briefed and argued" the difficult legal issues that have been posed. Likewise, the briefs and arguments of the *amici curiae*—whose presence underscores the public interest in this case—have dealt exhaustively with the same issues. The interests of the accused cannot be injured by our prompt consideration of his petition for extraordinary relief. Moreover, we see no likelihood that the interests of the Government can be prejudiced by our determining at this time the merits of the two issues now before us on Murray's petition. Therefore, we proceed to the merits.

---

**3.** The Carlucci Memorandum stated these guidelines in paragraph 2:

 a. Mandatory urinalysis testing for controlled substances may be conducted during—

 (1) An inspection under Military Rule of Evidence 313;

 (2) A search or seizure under Military Rules of Evidence 311–317;

 (3) An examination for a valid medical purpose under Military Rule of Evidence 312(f) to determine a member's fitness for duty; to ascertain whether a member requires counseling, treatment, or rehabilitation for drug abuse; or in conjunction with a member's participation in a DoD drug treatment and rehabilitation program; or

 (4) Any other examination for a valid medical purpose under Military Rule of Evidence 312(f).

Paragraph 3a precluded use in courts-martial of results obtained under paragraph a(3) above, except as impeachment or rebuttal (para. 3d).

## III

### Service-Connection of the Offense

■ This Court has long recognized "the disastrous effects occasioned by the wrongful use of narcotics on the health, morale and fitness for duty of persons in the armed forces." *United States v. Williams,* 8 U.S. C.M.A. 325, 327, 24 C.M.R. 135, 137 (1957). Indeed, in *United States v. Beeker,* 18 U.S. C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969), a case decided after the decision in *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), we held:

> Apart from the specifics of Federal and State law, use of marihuana and narcotics by military persons on or off a military base has special military significance. . . . As a result, the circumstance of "no military significance," described in *O'Callahan* as an essential condition for the limitation on court-martial jurisdiction, is not present as to the offenses alleged.
>
> 2. As with the case of use of marihuana, possession of marihuana by military persons is a matter of immediate and direct concern to the military as an act intimately concerned with prejudice to good order and discipline or to the discredit of the armed forces. [Citations omitted.] Like wrongful use, wrongful possession of marihuana and narcotics on or off base has singular military significance which carries the act outside the limitation on military jurisdiction set out in the *O'Callahan* case.

Subsequently, in dissolving an injunction against trial of the petitioner by court-martial for off-base sale of marihuana to a military undercover agent, the Supreme Court noted:

> Although we do not address factual issues in this opinion, we note—in view of Mr. Justice Brennan's position—the Solicitor General's statement that "drug abuse is a far more serious problem in the military context than in civilian life." [Citation omitted.] The seriousness of the problem is indicated by information

presented before congressional committees to the effect that some 86,000 servicemen underwent some type of rehabilitation for drug abuse in fiscal years 1972 and 1973, and only 52% of these were able to return to duty after rehabilitation. [Citations omitted.] It is not surprising, in view of the nature and magnitude of the problem, that in *United States v. Beeker,* 18 U.S.C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969), the Court of Military Appeals found that "use of marihuana and narcotics by military persons on or off a military base has special military significance" in light of the "disastrous effects" of these substances " 'on the health, morale and fitness for duty of persons in the armed forces.' "

*Schlesinger v. Councilman, supra,* 420 U.S. at 760 n. 34, 95 S.Ct. at 1314 n. 34.

In upholding a compulsory urinalysis program instituted by the Army in Europe, the Court of Appeals for the District of Columbia observed: [4]

> 1. The increased incidence of drug abuse in the Armed Forces poses a substantial threat to the readiness and efficiency of our military forces. Unlike the civilian population, the military forces are charged with the responsibility of continuously protecting the nation's interests both on the domestic and international level. Widespread use of marihuana, hashish and other drugs can have a serious debilitating effect on the ability of the Armed Services to perform their mission. As noted in the extensive evidence submitted by the appellants, drug use among GIs in the USAREUR had (a) lessened the on-the-job efficiency of GIs; (b) significantly reduced the number of effective soldiers in the European command; (c) required the expenditure of enormous amounts of supervisory time to monitor all aspects of the drug control and rehabilitation process; (d) strained the limited medical resources of the European Command; (e) created a significant

4. *Committee for GI Rights v. Callaway,* 518 F.2d 466, 476–77 (D.C.Cir.1975) (footnotes

omitted).

health threat; and (f) resulted in an increased incidence of crime.

See also Peterson v. Goodwin, 512 F.2d 479, 480 (5th Cir.), cert. denied, 423 U.S. 931, 96 S.Ct. 282, 46 L.Ed.2d 260 (1975).

In United States v. Trottier, 9 M.J. 337 (C.M.A.1980), the accused had been convicted of both on-base and off-base sales of drugs. Mindful of the menace to military effectiveness posed by drug abuse, we ruled on appeal that all of the offenses were service-connected and that an Air Force special court-martial had jurisdiction to try them. Although only sales of drugs were before us, our rationale extended to other drug offenses. Thus, we stated:

> [I]n considering the scope of military jurisdiction, the prospect cannot be ignored that prosecution of those servicepersons who possess, use, and distribute drugs off post will tend to dry up sources of drugs for others who would use them on or near a military installation to the detriment of the military mission.

Id. at 350. We also emphasized that "[o]nly under unusual circumstances, then, can it be concluded that drug abuse by a serviceperson would not have a major and direct untoward impact on the military." Id., n. 28.

We were aware, of course, that some civil jurisdictions no longer prosecute certain drug offenses—especially those involving possession or use of small quantities of marihuana.[5] However, we also recognize that the military community is unique in many respects and that its system of justice must be responsive to needs not present in the civil society. Cf. Chappell v. Wallace, —— U.S. ——, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); Schlesinger v. Councilman, supra; Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Since drug offenses off post, as well as on post, present a special threat to the performance of the mission entrusted by the Constitution and Congress to the Armed Services, we concluded in Trottier that such offenses generally are service-connected and therefore can be tried by court-martial.

Nonetheless, in light of O'Callahan v. Parker, supra, and Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), we did not in Trottier return fully to the holding of United States v. Beeker, supra, that, by reason of a servicemember's status, every drug offense he commits ipso facto is service-connected. To emphasize that Beeker had not been reincarnated, we commented in Trottier:

> For instance, it would not appear that use of marihuana by a serviceperson on a lengthy period of leave away from the military community would have such an effect on the military as to warrant the invocation of a claim of special military interest and significance adequate to support court-martial jurisdiction under O'Callahan. Similarly, the interest of the military in the sale of a small amount of a contraband substance by a military person to a civilian for the latter's personal use seems attenuated. See United States v. Morley, 20 U.S.C.M.A. 179, 43 C.M.R. 19 (1970).

9 M.J. at 350 n. 28.

By recognizing that, under some circumstances, a leave status significantly changes a servicemember's usual relationship to his Service, we followed the Supreme Court's lead in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which—while holding that three servicemembers on active duty could not recover under the Federal Tort Claims Act—distinguished an earlier case in this manner:

> The injury to Brooks did not arise out of or in the course of military duty. Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission. A Government-owned and operated vehicle collided with him. Brooks' father, riding in the same car, recovered from his inju-

---

**5.** See An Analysis of Marijuana Policy 6–9, 12–14 (National Academy Press, Washington, D.C. 1982).

ries and the Government did not further contest the judgment but contended that there could be no liability to the sons, solely because they were in the Army. This Court rejected the contention, primarily because *Brooks' relationship while on leave was not analogous to that of a soldier injured while performing duties under orders.*

*Id.* at 146, 71 S.Ct. at 159 (emphasis supplied).

No matter how long his period of leave or how distant he may be from military installations while on leave, a servicemember is responsible to be fit for duty when he returns from leave. In this connection, we recall the comment in *Trottier* that "[i]ndeed, in many instances the drugs will enter the military installation in their most lethal form—namely, when they are coursing through the body of a user." *Id.* at 349. We are convinced that, even when a servicemember uses a psychoactive drug in private while he is on extended leave far away from any military installation, that use is service-connected, if he later enters a military installation while subject to any physiological or psychological effects of the drug.[6] Such use falls outside the scope of the exception mentioned in the *Trottier* footnote.

■ According to the evidence received during the Article 39(a) session, a trace of THC was present in Murray's urine specimen when he reported to the Philadelphia Naval Base. The record does not make clear what are the physiological or psychological effects, if any, of the presence of this metabolite in his body; and we cannot take judicial notice of those effects.

Under these circumstances, we conclude that, in the proper exercise of our discretion, we should not intervene at this point to prevent trial on the merits because of the claimed lack of service-connection of the offense charged.

We can find no basis for determining that the military judge sought to usurp power or flout applicable precedents in his consideration of service-connection; nor did he abuse his discretion in any way. *Cf. United States v. LaBella, supra.* After trial on the merits, there may be more extensive evidence in the record as to the presence or absence of service-connection of any use of marihuana by petitioner. Moreover, in a trial Murray will enjoy the safeguard that, in order to convict him, the Government must convince the trier of fact beyond a reasonable doubt that his use of marihuana was service-discrediting or to the prejudice of good order and discipline. *Cf.* Article 134.[7] In the event of a conviction, the question of service-connection can be examined further during regular appellate review of the case.

We conclude, therefore, that petitioner should be denied extraordinary relief in connection with his attack on the court-martial's jurisdiction over the offense charged. However, this denial is without prejudice to his right to renew his attack at the trial level and upon any further appellate review of the case.

## IV

### *Compulsory Urinalysis*

■ The Supreme Court has held that body fluids do not fall within the purview of the Fifth Amendment. *South Dakota v. Neville,* —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Article 31, UCMJ, 10 U.S.C. § 831, should be interpreted in light of

---

**6.** The Supreme Court has repeatedly recognized the importance of protecting the security and integrity of military installations. *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S.

886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). *Cf. United States v. Alleyne,* 13 M.J. 331 (C.M.A. 1982).

**7.** Since the charge presently alleges that the use of marihuana by Murray took place in the Philadelphia area, the judge at trial may be confronted with an issue of variance.

these precedents. *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980). In *Armstrong,* we held that blood samples are not included within the protection accorded to servicemembers by Article 31 and the Fifth Amendment. Urine specimens fall within the same rationale.

 Furthermore, the manner of obtaining the urine specimen from Murray did not violate due process, as did the investigative procedures used by the police in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). There was no physical intrusion into petitioner's body—as occurs with stomach pumping, catheterization, or drawing of blood. There was no pain, risk of infection, or trauma involved in the method used to obtain the urine specimen from Murray.

 As to the admissibility of the urine specimen, the chief issue is compliance with the Fourth Amendment, which shields American servicemembers from unreasonable searches and seizures. *See United States v. Middleton,* 10 M.J. 123, 127 (C.M.A.1981); *United States v. Ezell,* 6 M.J. 307, 313 (C.M.A.1979). In resolving that issue, this passage from *Middleton* provides a starting point:

> This is not to say, however, that in its application the Fourth Amendment does not take into account the exigencies of military necessity and unique conditions that may exist within the military society. Military exigencies may be present under the particular facts of a given case, *see, e.g., United States v. Hessler,* 7 M.J. 9 (C.M.A.1979); or they may exist with respect to a whole category of intrusions, *see United States v. Harris,* 5 M.J. 44 (C.M.A.1978); *United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973); *United States v. Poundstone,* 22 U.S.C. M.A. 277, 46 C.M.R. 277 (1973). Of course, when it is suggested that a different rule should apply to military searches and seizures than to those in the civilian community, some burden exists to show the need for such a variation.

10 M.J. at 127 (footnote omitted).

In connection with a previous program of compulsory urinalysis conducted by the Army in Europe, the Fourth Amendment issue was resolved in favor of the Government in *Committee for GI Rights v. Callaway,* 518 F.2d 466 (D.C.Cir.1975). There the Court of Appeals relied on these factors:

1. The increased incidence of drug abuse in the Armed Forces poses a substantial threat to the readiness and efficiency of our military forces.

2. The "expectation of privacy" [citation omitted] is different in the military than it is in civilian life.

3. The primary purpose of the drug inspections is to ferret out illegal drugs as a means of protecting the health of the unit and assuring its fitness to accomplish its mission.

4. Given the nature of drugs and the paraphernalia associated therewith, unannounced drug inspections appear to be the most effective means of identifying drug users so that they might receive treatment and eliminating illegal and debilitating drugs from a unit.

5. In authorizing drug inspections, the Army has attempted to guard the dignity and privacy of the soldier insofar as practical.

518 F.2d at 476–77.

For the most part, these same factors apply to the current compulsory programs initiated in the Armed Services by the Carlucci Memorandum. They support the conclusion that, even though the compulsory urinalysis to which Murray was subjected at the Philadelphia Naval Base constituted a "seizure" of his urine within the meaning of the Fourth Amendment, this seizure was reasonable. *Cf. United States v. Middleton, supra.*

Although the Military Rules of Evidence have taken effect after the decision in *Committee for GI Rights v. Callaway, supra,* they do not require a different result. At first blush, Mil.R.Evid. 312 seems especially relevant to compulsory urinalysis, for it contains a subsection on *"Seizure of bodily fluids."* However, upon closer examination, we conclude that this provision does not

concern obtaining a urine specimen by an order to a servicemember that he provide such a specimen. In this regard, we agree with a panel of the Navy-Marine Corps Court of Military Review that the term "extraction" in Mil.R.Evid. 312(d) does not encompass compelling someone to provide a urine specimen through the normal process of excretion. *United States v. Wade,* 15 M.J. 993, 999 (N.M.C.M.R.1983), rev'd on other grounds, 16 M.J. 115 (C.M.A.1983). Instead, "extraction" refers to procedures, such as catheterization or drawing blood with a needle, which are quite different from urinating into a bottle or blowing air into a breathalyzer. Furthermore, furnishing a urine specimen—even pursuant to a military order or direction—is not an "intrusion into" a body cavity within the meaning of Mil.R.Evid. 312(c) or an "intrusive search of the body" within the meaning of Mil. R.Evid. 312(e).

The Government has suggested that compulsory urinalysis is permissible because it is an "inspection" within the meaning of this definition in Mil.R.Evid. 313(b):

> An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle.

The Rule also explains that

> [a]n inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband when such property would affect adversely the

security, military fitness, or good order and discipline of the command and when (1) there is a reasonable suspicion that such property is present in the command or (2) the examination is a previously scheduled examination of the command.

Certainly, the requirement that all sailors reporting to an "A" School be subjected to compulsory urinalysis is similar to an examination of persons and vehicles entering a military installation in order to assure their military fitness and discipline. *See* Mil.R. Evid. 313(b). However, it is not necessary—or even profitable—to try to fit compulsory urinalysis within the specific terms of that Rule. We have made clear that a search may be reasonable even though it does not fit neatly into a category specifically authorized by a Military Rule of Evidence.

Thus, in *United States v. Alleyne,* 13 M.J. 331 (C.M.A.1982), we upheld a search conducted of persons exiting from an American overseas military installation although the Military Rules of Evidence only dealt specifically with an entry search. Since the same rationale supported both types of searches, we felt sure that the draftsmen of the Military Rules of Evidence did not intend by implication to invalidate exit searches.

Compulsory urinalysis under the circumstances of the present case is justified by the same considerations that permit health and welfare inspections. Therefore, we conclude that the draftsmen of the Rules also did not intend to invalidate that procedure *sub silentio* by their failure to authorize it specifically. Indeed, Mil.R.Evid. 314(k) makes this very point by providing:

> A search of a type not otherwise included in this rule and not requiring probable cause under rule 315 may be conducted when permissible under the Constitution of the United States as applied to members of the armed forces.

Nothing in the record of trial indicates that the compulsory urinalysis was conducted in an offensive manner or under circumstances which would tend to humiliate or degrade petitioner. As noted earlier, he was not singled out in any way for the urinalysis.

■ A military order apparently provided the means for compelling Murray to provide the urine specimen. Such an order was not prohibited by Article 31. *United States v. Armstrong, supra.* Moreover, to use the authority of a military order or command to obtain a urine specimen is a reasonable procedure in the context of the military society. As Judge Cook wrote for a unanimous Court in *United States v. Schneider,* 14 M.J. 189, 192 (C.M.A.1982):

> The obligations of the military member occasioned by his military status and by the relationships inherent in a military organization are different from those of the citizen to the police. There are numerous situations in the military context where a military person is required to provide information to military authorities without consideration of the existence of probable cause to detain. [Citations omitted.] This may occur on the street, in offices, and in hearing rooms, as well as in places specifically provided for interrogation. And the obligation to report to such places for the purpose of giving such information, if properly related to the military mission, is a valid military duty.

(Footnote omitted.)

From the record before us we cannot say that the military judge clearly ignored and disregarded applicable rules and precedents in ruling on petitioner's motion to suppress the evidence obtained by compulsory urinalysis. Therefore, no extraordinary relief should be granted as to that ruling, *cf. United States v. LaBella, supra,* although it also can be reviewed further in the course of any regular appellate review.

V

The petition for extraordinary relief is denied.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

I agree with my Brother Judges that this petition for extraordinary relief should be denied. In view of my conservative approach to the use of extraordinary writs, I cannot join that portion of their opinion suggesting a broader interpretation of our power. *See Shepardson v. Roberts,* 14 M.J. 354, 359 (C.M.A.1983) (Fletcher, J., dissenting); *see also Wickham v. Hall,* 12 M.J. 145, 153 (C.M.A.1981) (Fletcher, J., concurring in the result). Dismissal of this petition in my opinion would be more appropriate.

As to the substantive issues raised in this petition and commented on by the majority, I must reserve judgment. As the majority notes, "Apparently, the Government's only evidence that Murray had used marihuana was provided by the compulsory urinalysis." 16 M.J. 74, 76. In this context, serious questions may be raised and should be resolved at the trial level concerning the sufficiency of the Government's proof. *See United States v. Ford,* 4 U.S.C.M.A. 611, 16 C.M.R. 185 (C.M.A.1954); *United States v. Ellibee,* 13 C.M.R. 416 (A.B.R.1953); *see generally Prosecution of Drug Offenders Based on The Newly Developed Urine Test (Part I),* 1 Trial Counsel Forum 2 (No. 2, Sept. 1982), U.S. Army Legal Services Agency. The trial court's resolution of these questions may render the substantive issues raised in this petition moot or, at the very least, provide this Court with an adequate record to decide these issues.