**UNITED STATES**

v.

**Mark B. SCHOMAKER, 127 62 9459, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 83 5285.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 27 July 1983.

Decided 30 April 1984.

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

LT Kathleen P. McTighe, JAGC, USNR, Appellate Defense Counsel.

LT Sandra R. Ganus, JAGC, USNR, Appellate Government Counsel.

Before SANDERS, Senior Judge, and MAY and CASSEL, JJ.

MAY, Judge:

Appellant was convicted, pursuant to his pleas, of the use and possession of marijuana in violation of Article 134, Uniform Code of Military Justice (UCMJ) 10 U.S.C. § 934. Appellant was sentenced by a panel of officer members to a bad conduct discharge from the naval service; confinement at hard labor for 90 days; forfeiture of $367.00 per month for three months; and reduction to pay grade E–1. In accordance with the terms of a pretrial agreement, the convening authority approved the sentence, but suspended for six months all confinement in excess of 30 days.

Appellant assigns among others, the following error:

PLAIN ERROR OCCURRED WHEN THE TRIAL COUNSEL MADE REFERENCE TO THE MARINE CORPS POLICY CONCERNING ILLEGAL DRUGS DURING HIS PRESENTENCING ARGUMENT BEFORE MEMBERS.

We agree. We believe some discussion is merited, however, given the impact of our decision here. The concept of command influence has always been a troublesome issue, given the inherent realities of military command structure, the role and powers of the convening authority, and the obvious and necessary need for our military commanders to establish appropriate policies related to discipline coupled with their necessary responsibility for the mission readiness of their forces. *See United States v. Grady,* 15 M.J. 275 (C.M.A.1983); *United States v. Johnson,* 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964).

These concerns, when considered alongside the necessary desire by Congress, the nation, and certainly those in our armed forces, for a fair and untainted criminal process, are usually and commendably not reflective of discordant or contradictory interests. However, within the necessary tension between the commander's need to effectively lead, train, and unceasingly prepare his forces for the accomplishment of their missions, and the demands of an effective, responsive, and fair military criminal justice system, lie inevitable possibilities for instances of conflict and prejudicial impact upon a given military defendant.

This Court is aware of the necessity for service-wide and national concern for the dimensions of the illegal drug and narcotics problem within our armed forces and the necessary efforts of the military commanders, service heads and departmental officials to eradicate the illegal use and distribution of narcotics within our forces. *See United States v. Trottier,* 9 M.J. 337 (C.M.A.1980); *United States v. Harvey,* 12 M.J. 626 (N.M.C.M.R.1981). The enunciation and communication of service-wide or local command policies, however, aimed at illegal drug use and trafficking, inescapably create a climate that must be the concern of all involved within the military criminal justice system. Commanders, staff judge advocates, and the trial judiciary must insure that proper and necessary command directives are not improperly allowed to permeate the military court-martial system. The nuances and subjective impact of the commander's proper desires cannot be communicated within the trial process in a manner that implies that a given commander desires a given result, or as is more likely, that a given trial result will be perceived by court members as being in keeping with the service's ethic as personified in a policy directive.

It is obviously difficult to measure the specific impact of command directives, published policies, or personal expressions by commanders. Even the most conscientious member may deliberate, particularly on sentencing decisions where some assurance of the individual accused's guilt is already present, toward a sentencing decision consonant with what the member perceives to be the "right" choice of sentencing alternatives; the "right" choice being that decision most acceptable to the sensibilities of the court member. The deliberative pro-

cesses of a court member may have so assimilated local or service-wide policy directives that there may occur an unconscious equating of the "right" decision with what his or her professional allegiance and experience have traditionally responded to: the intent, desire, or orders of his superiors in the command chain. We, of course, cannot ascertain with any certainty the actual impact, if any, of references to command policies on court members, individually or collectively. We must perforce operate on the side of reasonable caution and with the understanding that the appellate process is the level of last resort for a sentenced military member. *See generally United States v. Stennis,* 12 M.J. 813, 816–17 (N.M.C.M.R.1981).

We can generally presume with great confidence that those officers and enlisted members selected in accordance with paragraph 4d, *Manual for Courts-Martial, 1969 (Rev.),* and appointed to serve on court-martial panels will carry out the dictates of their oaths. We cannot, however, on such belief refrain from the examination of the circumstances present in each case where the issue of command influence is substantially raised. Turning to the case at hand, we learn from the trial record that during voir dire, the following exchange occurred between the trial judge and defense counsel during the defense counsel's attempt at individual voir dire of the then senior member of the panel:

(Defense counsel's question directed at Lieutenant Colonel W_____):

DC: Sir, do you feel that an accused who had pled guilty and been found guilty of marijuana use should necessary [sic] receive a bad conduct discharge, knowing nothing more about this case than you do at the present time?

MJ: That had been asked and answered, counsel. I asked if the members had any preconceived formulas or inelastic attitudes regarding a sentence that must be awarded. That had been asked and answered.

DC: Your Honor, is it permissible to delve into the inelastic attitude as it may pertain to government evidence in aggravation?

MJ: I believe that I asked the membership if they would be able to award a sentence in this case bearing in mind that they must consider all of the evidence that is presented in extenuation and mitigation as well as that in aggravation and base their sentence on that and the instructions that I give them. All members answered affirmatively. That answers the question for me, counsel.

DC: Is it his honor's ruling then that all questions of this line would be repetitive and unnecessary?

MJ: I would think so.

DC: The defense has no further voir dire. Thank you, sir.

At the commencement of the presentencing portion of the trial, the government presented as an *aggravation* witness the testimony of a staff noncommissioned officer from appellant's unit. During that testimony, the following statements were elicited:

Q. Okay. Staff Sergeant D_____, what I would like you to do is to outline for the members in this case the efforts that have been made down at the Drum and Bugle Corps to dissuade the use and possession of marijuana by members of your section?

A. Okay, sir. There have been several counseling sessions. When I first got here, there were members of the Drum and Bugle Corps that were on the urinalysis tests. Okay, and since that time, they have been counseled at least, I would say, approximately once a month.

Q. Okay, now when you first got here, that was January of 1982?

A. Yes, sir.

Q. Did anything significant happen about that time concerning marijuana?

A. Yes, sir. That is when the Commandant came out with the ALMAR, 246–81. And during that time, the whole Base was being counseled on this new ALMAR and what would happen.

Q. Specifically, let's talk about Lance Corporal SCHOMAKER, okay?

A. Yes, sir.

Q. Was that policy read to him?

A. Yes, sir, it was.

Q. When was that?

A. It was in January.

Q. Of 1982?

A. 1982.

Q. Since then, how many times has that policy been reread to Lance Corporal SCHOMAKER?

A. Many times, sir. It has been—let's see, at morning formations we were counseled, we were counseled by the Colonel, we were counseled by the General, we were counseled by different OIC's that we have had.

Q. Could you estimate the number of times?

A. Like I say, at least—at least once a month.

Q. And when you say that the General and the Colonel and the officers in charge would counsel you on that, what specifically did they tell you?

A. They said that the new ALMAR came out and they said possession, use and distribution of illegal drugs would not be tolerated in the Marine Corps and that if anyone was caught disciplinary actions would be taken.

Q. Did they tell you you would be kicked out of the Marine Corps if you used marijuana?

A. Yes, sir, they did. They said it depends on your past record and your worth to the Marine Corps.

Q. Was Lance Corporal SCHOMAKER advised that he could receive a bad conduct discharge if he would use marijuana?

A. Yes, sir.

We note that the above testimony was not offered in response to any assertions by appellant in extenuation or mitigation, but instead was presented, at first instance, in aggravation. The testimony was not, we also note, objected to by trial defense counsel. Following the appellant's sworn testimony in extenuation and mitigation, the following exchange occurred between the military judge and appellant in addressing a question submitted by a panel member:

MJ: [Reading question] Having been counseled on these previous occasions by different people, including your commanding officer and the Commanding Officer of Headquarters Battalion and the Commanding General of this Base, knowing what type of possible punishments there were for use and possession of illegal substances, why did you continue to use illegal substances?

A. Sir, I used them very infrequently, and—

Q. That is not being responsive. Why did you use them at all after being aware of what could happen to you for using? Why did you do it?

A. Well, they—the only time I used them is when, is when—

Q. That is still not being responsive to my question. Why did you use them at all?

A. Because it helped me along with my creativity in writing.

MJ: Does that answer your question, Lieutenant?

MEMBER: [First Lieutenant D_____]: Yes, sir.

After the presentation of evidence during the presentencing portion of the trial, the trial counsel, during his closing argument, made the following comments:

TC: Thank you, Your Honor. May it please the court, Mr. President, and members of the court: it is at this time as the military judge indicated that both counsel are allowed to make argument on what sentence should be awarded in the case. As the trial counsel, of course, I am the spokesman for the government and as such represent the government's interest in seeing that a fair and proper sentence is returned; a sentence which would be individualized for this accused yet is commensurate with the specifications before you, the need to rehabilitate this accused, and to deter others from committing similar crimes. Based upon all these factors, the government be-

lieves that the sentence should include a punitive discharge coupled with substantial confinement at hard labor. Now the reasons which necessitate such a sentence will be outlined as follows; it is primarily based upon the most aggravating factor in this case—that is the knowledge that the accused possessed when he committed the offenses.

You go clean back to December 1981 when the Commandant of the Marine Corps issued a directive outlining in no uncertain terms the Marine Corps position on drug abuse by members of the service, better known as ALMAR 246–81, as explained by Sergeant D_____. By that directive the number one officer in the Marine Corps declared war on drugs. And he embarked upon a fight to return to some of those attitudes and values that have made the Marine Corps the respected institution that it is. And he directed that this fight be carried on by the local commanders and so you have, as Staff Sergeant D_____ explained, the Battalion Commander standing in front of the accused. The Commanding General standing in front of the accused. OIC's on a monthly basis, these officers made effort, a concerted effort, to make the troops aware of exactly what would happen to them if they got caught. But these values and these attitudes are still being chipped away because Marines find it too easy to just light up a cigarette, Marines like the accused in this case, and smoke it. Because—I call him Marine but I use that term loosely—because Marines—it's a Marine's business to protect the country and to fight if need be. And a Marine has to be able to fight well, he has to be able to fight no matter how high the odds, no matter how rough the going gets, or how tough the battle, how exhausted his body may become. He has got to be ready both in mind and in spirit; because with today's technological weapons, a war may be lost within the first few hours. And the Marine Corps cannot and will not tolerate a mind which is fogged by marijuana.

As I indicated, the Commandant has declared a war on drugs, said that it is a civilian activity, it doesn't belong in our Marine Corps. And this was made clear to the accused—it is a civilian activity. And if he wants to continue or made it a practice to smoke marijuana on occasions, knowing full well how the Marine Corps stood, then make him a citizen today by issuing a bad conduct discharge.

Government appellate counsel persuasively argued during oral argument before us, that the trial counsel made reference to command and Marine Corps-wide policies solely to establish appellant's knowledge of the Marine Corps's, strong and commendable policy against illegal drugs. Certainly that argument has merit and under other circumstances, this court has accepted such limited use. *See United States v. Robertson*, 17 M.J. 846 (N.M.C.M. R.1984). Appellate defense counsel also persuasively argued during oral argument, that the references to service-wide Marine Corps policies, and in particular, the reference to the Commandant of the Marine Corps's specific position on illegal substances, constituted plain error and, in effect, brought the Commandant "into the deliberation room." *See Grady*, 15 M.J. at 276.

We are convinced, after examination of the entire record and after consideration of the assertions by appellate government and appellate defense counsel that the specific circumstances of this case clearly require reversal. Unlike *Robertson*, the military judge in this case took no affirmative action at the outset when the obvious issue of command and service-wide drug policy was raised in the testimony of Staff Sergeant D. Here there was no comprehensive voir dire of the court members, apparently the result of the trial judge's unduly restrictive view of defense counsel's early voir dire attempt. Nor, regardless of the arguable position of the government, does it appear that the primary purpose in referencing Marine Corps drug policy in the government's case and in closing argu-

ment, was to establish the appellant's "knowledge" of such policies. On the contrary, the appellant never asserted any lack of knowledge of Marine Corps drug policy. We do not accept the assertion of the government at trial or now, that its purpose in calling the members' attention to command policies as presented in this record, was to "rebut" any contention that appellant had no knowledge of such policies. We note that this "rebuttal" approach initially surfaced during the government's *aggravation* case, prior to any defense evidence in extenuation and mitigation, and which, in any event, involved no assertions by appellant of any ignorance of Marine Corps policy regarding illegal drug involvement.

We are particularly critical of the trial judge's failure in this case to take immediate remedial action *sua sponte* following the testimony of Staff Sergeant D. concerning Marine Corps drug policy. The defense counsel here also failed to take immediate steps, given the tenor of the witness's testimony, to call for an Article 39(a), 10 U.S.C. § 839(a), UCMJ session; to then object to the testimony, and to call for limiting instructions if the government could satisfy an objection as to the relevancy of the witness's testimony. If no such relevancy was established, then defense counsel should have moved that the testimony be stricken, that the members be given appropriate instructions, and properly voir dired to determine the impact of the testimony. Similar immediate action was obviously called for during the trial counsel's closing argument. We doubt, however, if the excesses in oration by the trial counsel would have occurred if earlier remedial action had been taken by the trial judge following the staff sergeant's testimony.

In any event we find the circumstances here clearly illustrate the need for a trial judge to be alert and to understand the potential for fatal error when objectively prejudicial issues are raised at trial and immediate judicial intervention is not undertaken. *See United States v. Reitz*, 17 M.J. 51 (C.M.A.1983); *United States v. Graves*, 1 M.J. 50 (C.M.A.1975).

We emphasize that there is no indication in the trial record that the court members in this case arrived at a sentencing decision at odds with their oaths or the standard instructions of the trial judge. We canot, however, in the face of the explicit references to command policies in this case coupled with the lack of any limiting instructions or other remedial action by the trial judge, affirm this sentence. We will therefore return this record for remedial action by authorities below.

Accordingly, the findings of guilty are affirmed but the sentence is set aside. The record of trial is returned to the Judge Advocate General of the Navy for submittal to the convening authority who may order a rehearing on the sentence if practicable.

Senior Judge SANDERS and Judge CASSEL concur.