**UNITED STATES**

v.

**J.C. BROWN, 255 66 4987, Staff Sergeant (E–6), U.S. Marine Corps.**

**NMCM 84 1767.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 20 Dec. 1983.

Decided 28 Dec. 1984.

LT Lois B. Agronick, JAGC, USNR, Appellate Defense Counsel.

Vincent A. Bertolini, Individual Defense Counsel.

LT John F. Carroll, Jr., JAGC, USNR, Appellate Government Counsel.

Before GORMLEY, KERCHEVAL and BARR, JJ.

GORMLEY, Chief Judge:

Appellant was convicted at a special court-martial before officer and enlisted members of one specification of possessing marijuana and one specification of using marijuana, both in violation of Article 134, Uniform Code of Military Justice (UCMJ) 10 U.S.C. § 934. Both specifications alleged possession and use "somewhere within the Continental United States of America, sometime between 30 August 1983 and 13 September 1983", while appellant was on leave during a permanent change of station (PCS) move from Marine Wing Communications Squadron 18, Okinawa, Japan, to Marine Corps Logistics Base, Albany, Georgia. The offenses were discovered pursuant to a routine urinalysis drug screening for which appellant tested "positive", and were treated as multiplicious for sentencing purposes. His sentence included reduction from staff sergeant to the lowest enlisted pay grade and a bad-conduct discharge. The convening and supervisory authorities approved the sentence as adjudged.

Several of appellant's assignments are premised on certain language employed by the Court of Military Appeals in *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983), relating to subject matter jurisdiction over drug usage by a servicemember while off-base on a period of extended leave.

## II

PREJUDICIAL ERROR WAS COMMITTED IN PERMITTING A PUBLIC HEALTH SERVICE OFFICER TO TESTIFY AS AN EXPERT WITNESS OF THE PHYSIOLOGICAL AND PSYCHOLOGICAL EFFECTS OF (SIC) THE ACCUSED BY THE ALLEGED INGESTION OF CANNABINOID METABOLITIES.

## III

THE ACCUSED (SIC) MOTION TO DISMISS THE CHARGE AND THE TWO SPECIFICATIONS THEREUNDER UPON THE GROUNDS THAT THE

GOVERNMENT DID NOT HAVE JURISDICTION OVER THE SUBJECT OFFENSES, WAS ERRONEOUSLY DENIED.

Appellant asserts that there is no military jurisdiction over a servicemember who returns from extended leave and is no longer "subject to any physiological and psychological effects" of illegal drugs.[1] He also extends this assertion to an argument that proving physiological and psychological effects is a necessary element for proving the Article 134, UCMJ, element of "prejudice of good order and discipline in the armed forces." We reject both of these arguments.

We are challenged in this case to decide whether the announced "War on Drugs" by the Commandant of the Marine Corps[2] and the Chief of Naval Operations[3] can be waged against all marines and sailors who may be using illegal drugs, regardless of any artificial distinctions relating to the situs of their leave or liberty. We preface our discussion of the juridical effects of the "physiological and psychological effects" language of Murray, supra, by stating that long or short term leave orders shall not be a license for illegal drug use by members of the Naval Service.

In our examination of the application of the "physiological and psychological effects" language of Murray, supra, we look to the current "benchmark" case for military subject matter jurisdiction over off-base drug offenses by service personnel—United States v. Trottier, 9 M.J. 337 (C.M.A.1980). We are guided in our analysis by the following language of the Court of Military Appeals in Trottier:

It is not unreasonable for an appellate court to be asked from time to time to reexamine an important decision widely affecting the court system which it supervises. Indeed, more than a reexamination of the conceptual correctness of the original decision may appropriately be solicited.

\* \* \* \* \* \*

Accordingly, while the jurisdictional test of service connection may remain firm, its application must vary to take account of changing conditions in the military society. Indeed, the Supreme Court's enumeration in Relford [v. Commandant, 401 US 355, 365–369, 91 S.Ct. 649, 655–657, 28 L.Ed.2d 102] of myriad factors and considerations relevant to service connection seems intended to promote flexible application of the concept, so that changing conditions can be responded to.

Id. at 344, 345.

The Court concluded in Trottier, "that almost every involvement of service personnel with the commerce in drugs is 'service connected'." Id. at 350. Its use, however, of the qualifying term "almost every involvement" was further qualified by a precatory statement in an accompanying footnote: "Only under unusual circumstances, then, can it be concluded that drug use by a serviceperson would not have a major and direct untoward impact on the military." Id. at 350 n. 28. The Court then went on to state two examples which created what have come to be known as the "Trottier exceptions." The first, which is at issue in this case, provides: " ... it would not appear that use of marijuana by a serviceperson on a lengthy period of leave away from the military community would have such an effect on the military as to warrant the invocation of a claim of special military interest and significance adequate to support court-martial jurisdiction under O'Callahan [v. Parker, 395 US

---

1. "We are convinced that, even when a servicemember uses a psychoactive drug in private while he is on extended leave far away from any military installation, that use is service-connected, *if he later enters a military installation while subject to any physiological or psychological effects of the drug.*" Murray, supra at 80 (emphasis added).

2. *Marine Corps Policy Concerning Illegal Drugs,* CMC msg. 010941Z Dec. 81 (ALMAR 246/81).

3. *Navy Policy Concerning Illegal Drugs,* CNO msg 231734 Dec. 81, NAVOP 172/81.

258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969)]." *Id.*[4]

Less than two weeks after the *Trottier* decision was issued, the Court of Military Appeals held that Article 31, UCMJ, 10 U.S.C. § 831, did not bar taking fluid samples from servicemembers. *United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980). This decision, coupled with the *Trottier* decision, paved the way for the implementation of a compulsory drug urinalysis program to assist the military in eradicating illegal drug use among its personnel. At the time, however, the military lacked a reliable testing methodology to detect the presence of marijuana and hashish metabolites in human urine. Subsequent to the *Trottier* and *Armstrong* cases, a technological breakthrough occurred in the science of detection of the psychoactive component of marijuana and hashish in urine, which introduced a fundamental change in the military's manner of handling drug abuse by its personnel.[5] A final administrative hurdle was cleared on December 28, 1981, by a Department of Defense Memorandum—known as the "Carlucci Memorandum"—which eliminated the ban against utilizing compulsory drug urinalysis results in UCMJ disciplinary proceedings.[6]

Based upon these developments, prosecutions were instituted against those who tested "positive" for illegal drugs during urinalysis screening. In the *Murray* case (supra), Petty Officer Murray tested "positive" during a urinalysis conducted within 48 hours after he reported to a Navy Apprentice School from a month's leave. Prior to his special court-martial, he petitioned the Court of Military Appeals through an extraordinary writ requesting prohibition of court-martial proceedings against him, claiming that the court-martial lacked subject matter jurisdiction over the offense and that the urine specimen had been unlawfully obtained from him.

The Court of Military Appeals rejected Petty Officer Murray's writ request, upheld the legality of the compulsory urinalysis program, and concluded that it would be inappropriate for the Court to intervene in the trial since the military judge had not "sought to usurp power or flout applicable precedents in his consideration of service-connection." *Murray, supra* at 80. The denial of the writ was "without prejudice to [appellant's] right to renew his attack at the trial level and upon any further appellate review of the case." *Id.* Although the trial court subsequently found jurisdiction, the case was never presented again for appellate review.[7]

In allowing the trial to proceed, the Court apparently negated the first *Trottier* exception for servicemembers on long term leave orders who use illegal drugs off-post.[8] That language, standing alone, would have "closed the loop" legally for effective prosecution of servicemembers who test "positive" for illegal drugs during random urinalysis inspections. Instead, an apparent loophole was created, exempting from that class of offenders those who did not "enter a military installation while subject to any physiological or psychological effects of the drug." *Murray, supra* at 80. Since the date of the Court's decision,

---

4. The second exception, not directly at issue in this case, provides, "Similarly, the interest of the military in the sale of a small amount of a contraband substance by a military person to a civilian for the latter's personal use seems attenuated. *See United States v. Morley*, 20 USCMA 179, 43 CMR 19 (1970)."

5. Wellington, *The War on Drugs in the Military Courtroom*, Federal Bar News and Journal, Sept./Oct. 1984, at 334, col. 2, *citing* Whiting and Manders, *Confirmation of Tetrahydracannabinol Metabolite in Urine by Gas Chromatography*, 6 Journal of Analytical Toxicology 49 (Jan./Feb. 1982).

6. Department of Defense Memorandum, Dec. 28, 1981.

7. Petty Officer Murray subsequently pled guilty at a special court-martial which found jurisdiction, but did not award him a punitive discharge. In that he was past the expiration date of his enlistment and because he was simply sentenced to restriction, he was immediately discharged from the Navy with an honorable discharge.

8. *See infra* n. 1 and accompanying text.

trial courts and those who practice before them have been struggling to interpret the meaning of "physiological and psychological effects" and its application to drug prosecutions.[9]

Appellant would limit the scope of the "physiological and psychological effects" language of *Murray, supra,* to require a showing of impairment of one's physiological or psychological processes. We perceive no intended limitation on the term "effects" beyond its generally understood meaning.[10] "Impairment" is a medical conclusion drawn from observing the *effects* of marijuana. Looking for physiological or psychological impairment, resulting from the effects of drug use would be relevant only for determining the legality of a prosecution resulting from a competency for duty examination or a probable cause urinalysis based upon observed impairment. In the instant case, the compulsory random urinalysis screening was not designed to discover drug use by those who are in a current state of impairment. Rather, its purpose is to detect *all* who have ingested illegal substances without reference to probable cause to believe that a particular servicemember is or was using illegal drugs. We agree in principle with our brethren on the Air Force Court of Military Review that "(i)n the present case the test was given on base and the results were positive for marijuana. That is sufficient physiological effect to establish jurisdiction." *United States v. Frost,* 19 M.J. 509 (A.F.C.M.R.1984). The following paragraphs are an explanation of our basis for advocating this conclusion.

It is important to note that we are not establishing a jurisdictional "litmus test" for *all* possible off-base drug offenses by servicemembers. It is still standard operating procedure for military courts seeking jurisdiction over these offenses to find that they are "service connected." *O'Callahan, supra; Relford, supra.* Each trial court must satisfy itself that it has jurisdiction on a case-by-case, offense-by-offense basis. *United States v. Sims,* 2 M.J. 109 (C.M.A.1977).

A servicemember is not merely "responsible to be fit for duty when he returns from leave." *Murray, supra* at 80. During any period of leave or liberty, a servicemember is *still* on active duty, is *still* subject to immediate recall, and "must be ready to perform [his or her] duty whenever the occasion arises." *Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980). It is inimical to military preparedness and the morale of drug-free, on-base servicemembers for there to remain any perception whatsoever in the military community that there is any "safe harbor" for those who use drugs. The use of marijuana *presumes* some detrimental effect upon its user, certainly at the time of ingestion, and arguably for some time thereafter. To require anything more than the detection of a threshold level of drugs in urine in order to show physiological or psychological effects is an invitation to servicemen to play the odds in a game of chemical tag relative to subject-matter jurisdiction.

In the case of on-base usage, it is *per se* service connected. In the case of off-base drug usage, however, because of the secretive nature of drug usage, there is

9. In numerous records of trial, we have observed that trial counsel have felt compelled to equate "physiological and psychological effects" with demonstrated physiological or psychological "impairment." They have called expert witnesses to testify *both* in defense to subject-matter jurisdiction challenges *and* on the merits to show "prejudice of good order and discipline in the armed forces." One purpose of this opinion is to dispel the notion that such legal "gymnastics" are necessary.

10. A venture into semantics is helpful to accentuate the general nature of the Court's language in *Murray, supra.* The word "effects" has no precise meaning. In its singular form, "effects" means "something that is produced by an agent or cause; something that follows immediately from an antecedent; a resultant condition." *Webster's Third New International Dictionary, unabridged* (G & C. Merrian Co., 1971) 724. When an individual ingests marijuana, one "result" or "condition" is that it will remain in his or her body, and consequently may be detectable through urinalysis.

no guarantee that such use will ever be detected on-base while a servicemember is in a state of physiological or psychological impairment. Indeed, only the careless or hopelessly addicted user would surface under such criteria. Compulsory drug urinalysis is the military's way of keeping its own house in order. There is no federal, state or municipal interest in an equivalent compulsory drug urinalysis to which its general civilian population would be subjected and prosecuted, except for a possible probable cause test in relation to a traffic offense or to determine the fitness for duty of its *own* public safety personnel. Thus, we conclude that when a servicemember's off-base drug usage is detected in his or her urine by an on-base urinalysis, regardless of any intervening period of leave or liberty, we do not perceive any competing interest of the civilian community in prosecuting that offense which is superior to that of the military in keeping itself free from all drug use by its servicemembers.[11] Based upon the foregoing, we reject any jurisdictional requirement that physiological or psychological "impairment" must be present at the moment when drug use is detected by a random urinalysis conducted on-base.

Thus, we view the Court of Military Appeals' language in *Murray, supra,* relating to "physiological effects," as merely restating the underlying presumption that gave rise to marijuana use being outlawed in the armed forces in the first instance—that its use at any time and at any place is contrary to military preparedness. For the prosecution of those whose on-base urinalysis screenings test "positive" for illegal drugs, we do not view the "effects" language as creating any additional element of proof for subject-matter jurisdiction, regardless of where or when they may have

been ingested. Accordingly, assignments of error II and III are without merit.

We categorically reject any attempt by appellate defense counsel to imply that *Murray, supra,* can be understood to require, in a prosecution for off-base drug use, proof on the merits of "physiological or psychological effects" in order to satisfy the Article 134, UCMJ element of "prejudice of good order and discipline in the armed forces." If appellant's drug use had become known to military authorities through means other than urinalysis (*e.g.,* the statement of an on-the-scene witness), there is no doubt that he could have been convicted without reference to any lingering physiological or psychological impairment. In the instant case, the urinalysis screening, without any bolstering by expert testimony relating to lasting impairment, was competent circumstantial evidence of appellant's drug use—a "chemical witness."

■ This Court, however, has previously noted the unique nature of drug prosecutions based solely upon urinalysis results and held that "special scrutiny of the evidence and the means of obtaining it must be made." *United States v. Hillman,* 18 M.J. 638 (N.M.C.M.R.1984). It should be noted in the instant case that the prosecution and defense expert witnesses testified that each was satisfied that the testing procedure utilized on appellant's urine sample was reliable and each was positive that the test accurately detected tetrahydrocannabinol metabolites in appellant's urine sample. Their testimony differed only on the subject of lingering physiological or psychological impairment from marijuana use. We are convinced that the urinalysis screening method utilized for detecting and prosecuting appellant was legally sufficient to prove his guilt beyond a reasonable

---

11. *See* Wellington, *infra* no. 5, at 337, col. 2: While tests used by the drug screening laboratories are able to determine that drug use occurred within ten days of the date the urine was obtained from the servicemember, they cannot ascertain *where* the drug was used. Since the service-connection limitation applies only to off-base offenses also cognizable

in federal or state courts [*citing United States v. Keaton,* 19 U.S.C.M.A. 64, 41 C.M.R. 64 (1969) ], it would appear that drug use detected by urinalysis is *per se* service connected due to the inability of any state or federal government entity to show that the offense occurred within its geographical boundaries.

doubt. Accordingly, assignment of error V is devoid of merit.

Appellant cites two remaining assignments of error, which we shall briefly discuss.

## A.

PLAIN ERROR OCCURRED WHEN REFERENCE WAS MADE BY TRIAL COUNSEL ABOUT CMC DRUG POLICY DURING PRESENTENCING ARGUMENT TO THE COURT MEMBERS AND THIS ERROR WAS NOT ADEQUATELY CURED BY THE MILITARY JUDGE IN HIS INSTRUCTIONS.

■ The trial counsel, in the instant case, made a facially impermissible reference to the Commandant of the Marine Corps' policy on drugs. Appellant is correct in noting that the trial counsel in the instant case was the trial counsel in *United States v. Schomaker*, 17 M.J. 1122 (N.M.C. M.R.1984), whose similar sentencing remarks *contributed* to the creation of reversible error in that case. Unlike *Schomaker*, here the trial counsel limited his reference to his sentencing argument, did not utilize it in direct or cross-examination of witnesses, and the military judge promptly brought the matter to the members' attention. We find that the military judge's curative instructions were sufficient to dispel any possible prejudice. *United States v. Grady*, 15 M.J. 275 (C.M. A.1983); *United States v. Robertson*, 17 M.J. 846 (N.M.C.M.R.1984). The assignment is without merit.

## B.

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY RULING THAT EXHIBIT (D[EFENSE] E[XHIBIT]) ["]A["] WAS INADMISSIBLE AS EVIDENCE IN HIS BEHALF.

■ Appellant offered into evidence, as a part of the defense case in chief, a document listing the "negative" results of eight urinalyses conducted subsequent to the "positive" result upon which his conviction is based. The military judge *admitted* the evidence with the following limiting instruction:

... Mr. President, members, Defense Exhibit A has been admitted for the purpose, the limited purpose, that is, this document is to be considered as some evidence which may or may not tend to discredit the expert testimony you have heard as to the reservoir theory of metabolites (remaining) in the body (after ingesting marijuana); you heard the various expert witnesses comment upon it. You may consider this evidence along with all other evidence in this case. Negative findings of subsequent tests, as are chronologized there, are not to be used solely to the exclusion of evidence of prior positive test results, obviously, which precipitated this series of tests which has been referred to in testimony as the "two-by-four" program. In other words, you may not take those negative findings to exclude the prior positive findings which obviously initiated this test. Is that understood? It is limited solely to be used by you how you may desire in weighing and evaluating the credibility, believability, the weight of the expert testimony you heard as to the reservoir theory of Metabolites, that you heard at length yesterday.

We find that the military judge's instruction was an accurate comment upon the probative value of the evidence. Prior testimony established that *all* urinalysis screenings for the presence of marijuana cannabinoid metabolites that did not meet a certain nanogram per milliliter threshold of metabolites were routinely reported "negative" and the sample discarded. It would be inappropriate to leave the members to believe that a "negative" result meant that there were no cannabinoid metabolites in appellant's body. We conclude, therefore, that this assignment of error is without merit.

Although not assigned as error by counsel, we have independently reviewed appellant's sentence and find it to be appropriate for his offenses. Accordingly, we affirm

the findings and sentence as approved on review below.

Judges KERCHEVAL and BARR. concur.