**UNITED STATES, Appellee,**

v.

**Bruce L. BAIR, Technical Sergeant,
U.S. Air Force, Appellant.**

No. 64,124.
ACM 27605.

U.S. Court of Military Appeals.

Argued Dec. 17, 1990.
Decided June 21, 1991.

For Appellant: *Vaughan E. Taylor* (argued); *Colonel Richard F. O'Hair* and *Major Bernard E. Doyle, Jr.* (on brief); *Lieutenant Colonel Jeffrey R. Owens.*

For Appellee: *Captain Morris D. Davis* (argued); *Colonel Robert E. Giovagnoni* (on brief); *Major Brenda J. Hollis.*

*Opinion of the Court*

EVERETT, Senior Judge:

Pursuant to conditional pleas of guilty, *see* RCM 910(a)(2), Manual for Courts-Martial, United States, 1984, a military judge sitting as a general court-martial convicted Technical Sergeant Bair of willfully disobeying a lawful order to submit a sample of his urine and of soliciting another to violate the same lawful order by providing appellant a sample that he could use in lieu of his own. *See* Arts. 90 and 134, Uniform Code of Military Justice, 10 USC §§ 890 and 934, respectively. Thereafter, the military judge sentenced appellant to a bad-conduct discharge, confinement for 9 months, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the Court of Military Review affirmed. 29 MJ 862 (1989).

On appellant's petition, we agreed to decide whether his commander—who acted on the basis of "an anonymous, unsubstantiated tip"—had the requisite "reasonable suspicion" under paragraph 5–8, Air Force Regulation (AFR) 30–2, to lawfully order that Bair submit a urine sample for testing. We decide that he did.

## I

The facts surrounding the offenses are fully set out in the opinion of the Court of Military Review in this case. 29 MJ at 863. For purposes of this appeal, we need focus only on the facts that led appellant's commander, Lieutenant Colonel Kind (then a major), to give the order.

Prior to entering his pleas, appellant made "a motion to dismiss or a motion for appropriate relief in that it is our contention that the order given in Charge I and relied on as the basis of Charge II was not a valid, lawful order...." Before presenting any testimonial evidence, appellant offered as an appellate exhibit "a copy of AFR 30-2 that was in effect ... at the time of the request for the commander directed urinalysis in this case—since it has changed since then."

The only evidence offered by either side on the motion was Kind's testimony. That testimony was clear and commendably candid; and it well sets up the legal issues that now are before this Court.

Under direct examination by defense counsel, Kind described what led to his order:

A. ... My first sergeant got a phone call from who I believe was the LE desk, the law enforcement desk. What it entailed was that they had received an anonymous phone call implicating Sergeant Bair and another individual in the squadron saying that they had used marijuana, or that they had been seen using marijuana. The real specifics ... I'm not ...

Q. You're not familiar with the specifics? Okay, then you were told this information by Chief Ivey, the First Sergeant?

A. Yes, correct.

Q. What was your reaction to that information?

A. I was fairly shocked. I didn't expect it.

Q. You didn't expect it, did you believe the information?

A. Well, I was hoping it wasn't true. I guess the fact that I just alluded to,

Sergeant Bair was what I considered one of my best troops—I was certainly hoping it wasn't true. I found it very difficult to believe.

Q. When you got that information, what did you decide to do with that information?

A. The First Sergeant and I discussed it and we decided that since ours was a flightline organization, that we had to insure that there was no illegal drug use. Since my policy on the flightline had been that there would be no illegal drug abuse accepted since it's incompatible with good aircraft maintenance, we elected to do a commander directed urinalysis.

Q. I understand that. What was your reason for ordering Sergeant Bair to do this urinalysis?

A. The reason was the anonymous phone call. There was a shadow of a doubt.

Any ambiguity about what Kind was referring to when he mentioned that the anonymous phone call had caused "a shadow of a doubt" was clarified somewhat later in defense counsel's direct examination:

Q. That was my next question. In situations where this issue had come up, someone you knew and you thought was outstanding before, that the reason for giving a urinalysis was a chance for them to clear the issue once and for all.

A. Well, that and to eliminate any question of doubt. I would have to say that if I get an anonymous phone call on my First Sergeant, I'd do a commander directed urinalysis on him too—under the old rules.

Q. Excuse me, I didn't understand that?

A. Well, if I got an anonymous phone call on anybody, even as trusting as my First Sergeant, I would think I would do the same thing.

Subsequently, defense counsel sought to explore Kind's reasoning process in light of the applicable legal standard of "reasonable suspicion":

Q. Since I talked to you on Friday afternoon, have you had an opportunity to talk with Captain Coakley [assistant trial counsel] or Captain Probasco [trial counsel]?

A. Captain Coakley.

Q. And did Captain Coakley explain to you what you would be testifying about today?

A. Just that ... ah ... well, I think so.

Q. Did he explain to you the issue of reasonable suspicion?

A. Ahh ... yes.

Q. What was his definition of reasonable suspicion?

A. He did not give one.

Q. Do you feel, using the words "reasonable suspicion" that you had a reasonable suspicion?

A. I think I did.

Q. That Sergeant Bair was using drugs at the time?

A. I think there was reasonable doubt.

Q. Reasonable doubt?

A. Maybe that's the word I would use. Reasonable doubt.

Subsequent examination of Colonel Kind by defense counsel, assistant trial counsel, and the military judge expanded somewhat Kind's testimony as to the anonymous tip, as to what other information Kind had had available, and as to what his response had been to the situation.

As to the tip: The anonymous tip had been from a female caller who had stated that Bair and Senior Airman Parker, another member of the same squadron, had used marijuana sometime recently—Kind believed but was not sure that the reported use had been the previous weekend. The tip contained no other details.

As to any other information available to Kind: He believed appellant was an "outstanding troop" and noncommissioned officer and had no reason, other than the tip, to believe Bair would use marijuana. Similarly, Kind knew Parker and had no reason—again, other than the tip—to believe that Parker used marijuana.

As to why he ordered the urinalysis: In light of Kind's paramount concern with flightline safety, *any* anonymous tip of this sort—even one involving a trustworthy subordinate—would cause "doubt" that would necessitate his ordering a commander-directed urinalysis. Indeed, as the military judge expressed it in one of her special findings prior to ruling on the motion, "Lt Colonel Kind said he viewed a suspicion of drug use as synonymous with flightline safety and ordered the test to protect the flightline, treating the call as true and assuming 'the worst case.'"

Ultimately, the military judge denied the motion. In the course of doing so, she articulated several "essential findings" of fact that are reflected in our recitation above, *see* RCM 905(d), as well as several underlying conclusions of law. The basis for the judge's ruling may be gleaned from these "conclusions":

One: To be lawful a command must relate to a specific military duty and be one which the superior commissioned officer was *authorized to give to the accused.*
. . .

Two: *Air Force Regulation 30–2 gives guidelines to a commander for deciding when to order a commander directed urinalysis.* Commanders are told they can refer members when there is a *reasonable suspicion of drug abuse.* ... While anonymous phone calls are odious, *the specific reference by the caller to the accused, to the drug used, and to a recent date when the caller said the accused had used marijuana, was for Lt Colonel Kind a reason to be suspicious and to order a urinalysis to assure the safety of all personnel using the flightline.*

\* \* \* \* \* \*

Five: *Lt Colonel Kind had a reason to order the test. His action,* even though it was based on an anonymous phone call, *was not arbitrary because the order was necessary and was a reasonable means to safeguard and protect the usefulness of the members of his command.* Lt Colonel Kind's order to

the accused to provide an adequate urine specimen to the Davis–Monthan Hospital Laboratory on 21 July 1988 was a lawful order.

(Emphasis added).

## II

As indicated earlier in this opinion, the regulation on which the parties in this case have focused throughout is AFR 30-2. Specifically, paragraph 5-8 of that regulation, dated 18 April 1986, prescribed:

A Command–Directed Examination. The commander can refer a military member for urine testing when there is a reasonable suspicion of drug abuse ... A command-directed examination may be conducted to determine a member's competency for duty and the need for counseling, rehabilitation, or other medical treatment:

a. Commanders usually direct urine testing in all unusual circumstances of aberrant, bizarre, or unlawful behavior in which probable cause does not exist but there is a reasonable suspicion of drug abuse. Such behavior may include, for example, unauthorized absences, violations of safety requirements, disobedience of direct orders, apprehension or investigation for drug offenses or intoxicated driving, involvement in crimes of violence, or other incidents involving repeated or serious breaches of discipline.... In addition, apathy or defective attitude, or personality change may, when examined in the context of other circumstances, lead to a reasonable suspicion of drug abuse and form the basis for command-directed urine testing.

b. Results obtained from command-directed testing may be used to refer a member to the Drug Rehabilitation Program and in administrative discharge action. Results may *not* be used against the member in any disciplinary action under the UCMJ, nor may they be used on the issue of characterization of discharge in separation proceedings....

Neither party has suggested at any stage that appellant could be convicted of violating Kind's order if that order—based on AFR 30-2—was not lawful.[1] Against this backdrop, this appeal presents two fundamental questions to this Court.

First, by what standard is "reasonable suspicion" to be measured in the context of AFR 30-2? Appellant urges that it must be measured by a Fourth Amendment standard; and, indeed, the court below, by virtue of the cases it cited in its opinion, implied that this is the standard it applied (although in so doing it ruled adversely to appellant's claims). 29 MJ at 864. Nonetheless, the Government contends that certain language in the regulation reflects "the fact that the drafters of the regulation did not use the term 'reasonable suspicion' in the same manner as the term is used in the criminal law arena." Specifically, the Government points to subparagraph "a" and to the fact that use of the results of a command-directed examination "in a criminal prosecution" is expressly proscribed. In place of the usual "criminal law" meaning of "reasonable suspicion," the Government argues:

The logical meaning of the term in the regulation is that a commander cannot single out a member for command-directed testing for no reason at all and must

---

[1] See *United States v. Wallace,* 2 MJ 1, 2 (CMA 1976) ("Inasmuch as the arrest order was illegal, the appellant's subsequent conviction for breaking arrest cannot be sustained."). Of course, the lawfulness of Kind's order—purportedly given pursuant to AFR 30-2—depends upon whether it was predicated upon "reasonable suspicion" as required by that regulation. *See United States v. Arguello,* 29 MJ 198, 203 (CMA 1989) ("The Supreme Court and this Court have also recognized that the Government is bound by its own regulations, especially when the regulation is one which confers a right or which benefits an individual."). In some earlier cases cited by the defense, the Air Force Court of Military Review had reversed convictions for failing to obey orders to submit urine specimens, because it concluded the orders did not comply with AFR 30-2.

This case was tried in terms of the lawfulness of Kind's order *under AFR 30-2,* and the appeal focused on the same issue. Therefore, we need not consider whether any alternative basis might exist for holding this order to be lawful.

have some basis for ordering the test.... The regulation was written for use by commanders, not legal technicians, and it is therefore unrealistic to define its terms by criminal law standards in this context.

Second, whatever the standard against which "reasonable suspicion" is to be measured in this context, did Kind have "reasonable suspicion" to order appellant to produce a sample of his urine? Appellant, of course, argues that he did not. Contrariwise, the Government submits that, by either a Fourth Amendment or some lesser standard, Kind had "reasonable suspicion" to order appellant to produce a sample of his urine under AFR 30–2.

### A

The answer to the first question is reasonably suggested by a thoughtful analysis of the opinions of the Supreme Court in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and of our unanimous opinion last term in *United States v. Bickel*, 30 MJ 277 (CMA 1990), which applied *Skinner* and *Von Raab* to the military's urinalysis program.[2]

In *Von Raab*, the Supreme Court held that compulsory urinalyses of some employees of the Customs Service—whose duties, the Government could show, warranted such an intrusion—were not unreasonable under the Fourth Amendment. The majority reasoned:

We have recognized, however, that the "operational realities of the workplace" may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts.... [I]t is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches....

**2.** Although consent and probable-cause searches are authorized under Mil.R.Evid. 314 and 315, Manual for Courts–Martial, United States, 1984,

489 U.S. at 671, 109 S.Ct. at 1393 (citations omitted). Similarly, the Court in *Skinner* upheld Department of Transportation regulations requiring blood and urine tests to be given to certain railroad employees after major train accidents.

In neither instance, though, were results of such tests to be used as criminal evidence. Referring to this in *Skinner*, Justice Kennedy wrote for the majority:

The FRA has prescribed toxicological tests, not to assist in the prosecution of employees but rather "to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs."

489 U.S. at 620–21, 109 S.Ct. at 1415.

After fully considering these two opinions in the context of urinalyses under the rationale of the routine inspection of Mil.R. Evid. 313, Manual, *supra*, we concluded in *Bickel*:

The very detailed regulations and policies established by the armed services for drug testing not only provide notice but also reduce the occasion for arbitrariness and abuse of discretion.

Even though the positive results of drug tests usually are available to military prosecutors, we do not believe that requiring servicemembers to submit urine specimens is an unreasonable intrusion. We might take a different view if the drug testing were designed solely to obtain evidence for criminal prosecution; but, as we understand the military drug-testing program, that is not the case. A positive drug test may result in admonition or adverse administrative action for a servicemember—rather than in criminal prosecution.

\* \* \* \* \* \*

Thus, we conclude that compulsory urinalysis may be performed as part of a military inspection without any requirement of probable cause or individualized suspicion.

the heart of the program is routine inspections sanctioned by Mil.R.Evid. 313.

The Supreme Court has not yet held that evidence discovered in a lawful administrative inspection is inadmissible in a criminal prosecution; and we doubt that the Court will ever apply the exclusionary rule to such evidence. Certainly, our Court has not done so—unless "the purported inspection" was "only a subterfuge for a search" for evidence to be used in a criminal prosecution. *See United States v. Thatcher*, 28 MJ 20, 24 (CMA 1989).

30 MJ at 285 (footnote omitted).

Of course, in *Bickel*, the "inspection" rationale under consideration concerned "examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle." Mil.R.Evid. 313(b). An inspection may include "an examination to locate and confiscate ... contraband," but it may not be "for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings"; otherwise, by definition, it "is not an inspection." Mil.R.Evid. 313(b).

In Bair's case, unlike the usual scenario of an "inspection," a particular individual was singled out for the urinalysis—a situation that presents a much greater risk that the "inspection" simply is a subterfuge for an unlawful, nonprobable-cause search. Twice in *Bickel*, we took care to distinguish our holding there from a situation in which a urinalysis is "designed solely to obtain evidence for criminal prosecution" or "was 'only a subterfuge for a search' for evidence to be used in a criminal prosecution." 30 MJ at 285.

Mil.R.Evid. 313(b) also recognizes the special risk that such an "inspection" might actually be "for the primary purpose of obtaining evidence for use in a trial" and, thus, in reality be a subterfuge for a search. Accordingly, the rule puts special restrictions on use of a urinalysis of a specific individual, as opposed to urinalyses of the whole or a nonindividualized part of a unit. In such instance, "the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of" Mil.R.Evid. 313(b).

Perhaps in recognition of these concerns, the drafters of AFR 30-2 provided that the results of a command-directed urinalysis of a particular individual may not be used as direct evidence in a court-martial. This provision certainly argues in favor of a contention that command-directed urinalyses are not primarily searches for criminal evidence. Nonetheless, under *Skinner* and *Von Raab*, a urinalysis may not be directed merely at the whim of a commander or on some "hunch." Moreover, it would be hard to justify a compulsory urinalysis as reasonable for Fourth Amendment purposes if it purported to be pursuant to a military directive but flouted the requirements imposed by that same regulation to protect the privacy rights of servicemembers. *United States v. Daskam*, 31 MJ 77 (CMA 1990).

In arguing that Kind's order to appellant satisfied AFR 30-2, the Government contends that "reasonable suspicion" is used in the regulation in a way different from how it has been used in a line of cases concerned with suppression of evidence because of Fourth Amendment violations. *See, e.g., Alabama v. White*, 496 U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct.1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In support of this contention, it is suggested that some of the "unusual circumstances of aberrant, bizarre, or unlawful behavior" set forth in subparagraph a of paragraph 5–8 would not be an adequate basis for the conventional "reasonable suspicion."

█ Inherent in this contention are some dangers from the Government's standpoint. If "reasonable suspicion" in the regulation has the undefined, but broad, scope that

the Government suggests, then the regulation is much more susceptible to constitutional attack under *Skinner* and *Von Raab*. Thus, to avoid serious constitutional issues, we believe that "reasonable suspicion" in AFR 30-2 should be interpreted in harmony with the construction of that term by the Supreme Court in determining the scope of Fourth Amendment prohibitions. Moreover, unless the drafters of the regulation intended "reasonable suspicion" to be interpreted in this manner, we cannot fathom—and the Government has not suggested—why they employed this term.

### B

The most recent Supreme Court discussion of "reasonable suspicion" is in *Alabama v. White, supra,* which involved a forcible stop of a vehicle because of an anonymous tip. There, the telephone report to the police was "that Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case." Alerted by this tip, police "officers saw a brown Plymouth station wagon with a broken right taillight in the parking lot in front of the 235 building," and then they observed a woman leave the building—but not carrying an attaché case—and enter the vehicle within the time frame indicated by the anonymous informant. Following the vehicle, the police corroborated that it was proceeding towards Dobey's Motel, but they did not verify the woman's name or "the precise apartment from which she left." 110 S.Ct. at 2414, 2416.

Although acknowledging that "it is a close case," six of the justices "conclude[d] that under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car." *Id.* at 2417.

Unlike *White*, the anonymous tip relayed to Lieutenant Colonel Kind contained no information as to the future action of third parties and, therefore, it could not be corroborated by surveillance. *Cf. Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Moreover, here the tip contained less detail than the one received by the police in *White*—although even there a discrepancy existed as to the informant's prediction that the suspect would be carrying an attaché case. In view of these differences, did the information available to Kind satisfy the requirements of "reasonable suspicion"—which admittedly is "less demanding ... than probable cause," *see United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoted in *Alabama v. White,* 110 S.Ct. at 2416).

The military judge, from her consideration of the evidence, answered this question in the affirmative. The Court of Military Review applied the test of "reasonable suspicion," as used in the context of criminal proceedings, and gave the same answer because the information received by Kind

> was not a blanket assertion that everybody in his organization used drugs. The information possessed some internal indicia of reliability in that it named specific individuals, the drug involved, and a general time frame the drug was used. The commander's decision to order a "command-directed" urinalysis was based on more than a "hunch" or a "generalized suspicion."

29 MJ at 864.

■ We recognize that here the commander was concerned with the harm that could result to flight operations if appellant were using marijuana, as had been reported. Thus, we might speculate that Lieutenant Colonel Kind might not have determined that "reasonable suspicion" existed if his squadron had been a headquarters unit involved in paper-pushing, rather than one concerned with flight operations. We do not believe that the magnitude of a possible harm from a suspected crime is irrelevant in determining the reasonable-

ness of the suspicion. Thus, if a military commander has received an anonymous tip that a member of his unit is involved in sabotage or terrorist activity, he may be entitled to more leeway in making an investigative stop than if the reported offense is a barracks theft.

We recognize that—like *White*—this is a "close case." However, for the same reasons as did the Court of Military Review, we conclude that "reasonable suspicion" existed and that the order received by Bair was lawful.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COX concurs.

SULLIVAN, Chief Judge (concurring in the result):

I concur in the result and vote to affirm appellant's conviction for this lawful-order violation. Art. 92, Uniform Code of Military Justice, 10 USC § 892. Admittedly the regulation at issue in this case was poorly written since some of its language appears to be somewhat inconsistent. The examples provided in the regulation conflict with its use of the term of art ("reasonable suspicion"), at least as that term is found in Supreme Court cases. Nevertheless, viewing this regulation in its entirety, I would hold that an anonymous tip meets the regulatory standard delineated in AFR 30–2. The examples for properly ordering a urinalysis are plainly less exacting than the standard fashioned for a criminal stop in *Alabama v. White*, 496 U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

The commander in this case was faced with a difficult choice. His decision, however, complied with the regulation in view of the following circumstances: The anonymous tip was specific and corroborated in minimum details. It identified recent use by appellant and a fellow squadron mate in their correct unit and identified the exact drug. These circumstances coupled with flight line safety concerns rendered this urinalysis order one contemplated within the regulation and hence lawful.