**UNITED STATES, Appellee,**

v.

**Johaan M. WILLIAMS, Airman First Class U.S. Air Force, Appellant.**

No. 66,524.
ACM 28298.

U.S. Court of Military Appeals.

Argued Dec. 4, 1991.

Decided Sept. 25, 1992.

For Appellant: *Major Alice M. Kottmyer* (argued); *Colonel Jeffrey R. Owens* (on brief); *Major Ronald G. Morgan.*

For Appellee: *Major Jeffrey C. Lindquist* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Major Paul H. Blackwell, Jr.* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

Appellant was tried by a military judge alone at a general court-martial on December 6 and 7, 1989, at Barksdale Air Force Base, Louisiana. He pleaded guilty to absence without leave from September 9 to 14, 1989, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886. He also entered conditional guilty pleas to using cocaine on divers occasions during the same period, in violation of Article 112a, UCMJ, 10 USC § 912a. The military judge accepted appellant's pleas, and sentenced him to a bad-conduct discharge, confinement and forfeiture of $466 pay per month for 13 months, and reduction in grade to E–1. The convening authority approved this sentence on February 1, 1990, and the Court of Military Review affirmed both the findings and sentence in an unpublished opinion on February 8, 1991.

We granted review of the following issue:

WHETHER EVIDENCE DERIVED FROM A COMMANDER–DIRECTED URINALYSIS MAY BE USED AGAINST AN APPELLANT AT TRIAL, BEYOND MERE REBUTTAL, WHERE

THE EVIDENCE WAS DISCOVERED AS A RESULT OF AN AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS [(AFOSI)] POLICY OF INTERVIEWING EVERYONE WHO HAD TESTED POSITIVE FOR COCAINE IN A COMMANDER–DIRECTED URINALYSIS.

We hold that neither Air Force Regulation (AFR) 30–2 (19 August 1988) nor the Fourth Amendment precluded admission in evidence of appellant's pretrial statements to AFOSI or the positive results of his AFOSI—requested urinalysis. *See generally United States v. Steward*, 31 MJ 259 (CMA 1990).

Appellant's guilty pleas were conditioned upon preservation of his motion to suppress certain government evidence. The pertinent facts were summarized in the following findings by the military judge:

## FACTS

1. In August 1989, the accused was ordered to provide a command-directed urinalysis upon his return from an unauthorized absence, in accordance with AFR 30–2, paragraph 5–8.

2. This urinalysis tested positive for the presence of the metabolite of cocaine. The test result was provided to the OSI at Pease Air Force Base prior to 14 September 1989. OSI agents attempted to interview the accused about this test but were unable to do so due to his absence from his unit. However, they did direct the unit to transport the accused to the OSI upon his return to Pease Air Force Base.

3. On 14 September 89, the accused arrived at Portsmouth, New Hampshire, at approximately 1345 hours, accompanied by his mother. He was met at the bus station by his First Sergeant, Master Sergeant Gerrish, who transported him to the OSI at Pease Air Force Base. Master Sergeant Gerrish told the accused that some people wanted to talk to him and that cooperation goes a long way in his, Gerrish's, book, or words to that effect.

4. After arriving at the OSI office, the agents introduced themselves to the accused and took him to an interview room. *The interview began at 1417 hours.* The accused was advised that he was being questioned about his AWOL from 9 to 14 September 89 and for use, possession, sale and/or transfer of marijuana, cocaine and/or other illegal substances while on duty in the United States Air Force. He was advised of his rights in accordance with Article 31 of the code. He acknowledged his understanding of his rights and consented to an interview. He refused to provide a written statement without the assistance of counsel. *After his rights advisement, the accused was asked whether he would consent to a search of his person, barracks room, urine, and personal bags and luggage in his possession. He orally agreed and subsequently read and signed a written consent form at 1426 hours.*

5. The search of his person and his luggage was negative. It was completed at 1441 hours.

6. *He was asked to provide a urine sample between 1441 and 1443 hours, but stated he couldn't go.*

7. At 1447 hours, the OSI agents, Master Sergeant Gerrish, and the accused left the OSI office and went to his barracks room. The search of the room began at 1445 [sic] hours and ended at 1545 hours. Nothing was found in the room and everyone returned to the OSI office.

8. *At 1604 hours, the actual questioning of the accused began.* He was reminded of his rights. Initially the accused denied using drugs. *During the course of his denials, Special Agent Gallant told the accused that they did not believe him because his August 89 urinalysis was positive for the presence of a metabolite of cocaine.* The accused continued to deny drug use and even told the agents that the urinalysis could not be used against him for anything but an administrative discharge. The OSI con-

firmed this as accurate. *Some 15 to 30 minutes after being informed of his positive urinalysis the accused told the agents that he had been to a party where cocaine was used and volunteered to show them the house. Eventually he admitted that he had used cocaine in August 89 and during his unauthorized absence in September 1989.* He also provided names of other individuals involved with drugs and volunteered to act as an informant for the OSI. The interview was terminated at 1711 hours.

9. After the interview was terminated, the accused had a smoke break with his First Sergeant. *During the break, the First Sergeant commented to the accused about his cooperation with the OSI and opined that maybe the accused could provide the urine sample now, or words to that effect. After the smoke break ended at 1724 hours, the accused then provided the urine sample to Special Agent Gallant.*

10. At 1735 hours, the accused and OSI agents went downtown to look for the Cubans' house. They returned at 1803 hours. Between 1803 and 1920 the accused was processed by the OSI. No further interrogation took place during this time.

11. After processing the accused, he was taken to the base hospital for a confinement physical. He was examined by Doctor Tedesco. He was admitted to the hospital for observation. The admission was based on the need for close observation because the OSI was concerned about the possible aftereffects of his drug use. Although the doctor also diagnosed bronchitis, the accused would not have been admitted to the hospital based on this diagnosis.

12. During the course of the interview, the accused was provided with smoke breaks and the opportunity to drink and eat. During the search of his room, the accused drank Gatorade and made a sandwich. Furthermore, during the course of the interview, he was cooperative, relaxed, mentally alert, in good spirits, and not in any physical distress.

13. The accused is 21 years of age and has been on active duty since 21 August 1987. He is a high school graduate and not a United States citizen.

(Emphasis added.)

---

Our first step in resolving this case is to identify the evidence which appellant argues could not be admitted at his court-martial. He particularly refers to all the potential evidence of his guilt[1] secured by the prosecution as a result of his interview by AFOSI on September 14, 1989. This includes his oral statements which implicated him in the charged offenses and the positive results of a urinalysis test which he took at the request of the OSI on that same date. *See generally United States v. White,* 27 MJ 264 (CMA 1988).

Next, we must particularly identify the reasons why appellant asserted the September 14th evidence should be inadmissible against him. In this regard, appellant focused on the command-directed urinalysis which he earlier took in August 1989 whose results were positive for cocaine. He contends that military investigators unlawfully relied on these results to target him for further questioning and to adduce the above-noted evidence from him concerning his subsequent drug use. Such an AFOSI investigation, he asserts, is prohibited by paragraph 5–8, AFR 30–2, and the Fourth Amendment. *See generally Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *cf. New York v. Burger,* 482 U.S. 691, 699–700, 716, 107 S.Ct. 2636, 2642, 2651, 96 L.Ed.2d 601 (1987). The crux of his argument is that the evidence secured by the AFOSI was tainted by his earlier coerced urinalysis. *See generally Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307

[1]. We note that appellant conditionally pleaded guilty, so none of the evidence now challenged was actually admitted against him at the trial.

*See* RCM 910(a)(2), Manual for Courts–Martial, United States, 1984.

(1939); *United States v. Kozak*, 12 MJ 389, 391 (CMA 1982).

## I

■ We will first address appellant's regulatory argument. Paragraph 5–8 of AFR 30–2 states:

5–8 **A Command–Directed Examination.** The commander can refer a military member for drug testing when there is a reasonable suspicion of drug abuse or when it is conducted as an examination of a specified member in conjunction with a member's participation in a DOD drug treatment and rehabilitation program. A command-directed examination may be conducted to determine a member's competency for duty and the need for counseling, rehabilitation, or other medical treatment:

a. Commanders usually direct drug testing in all unusual circumstances of aberrant, bizarre, or unlawful behavior in which probable cause does not exist but there is a reasonable suspicion of drug abuse. Such behavior may include, for example, unauthorized absences, violations of safety requirements, disobedience of direct orders, apprehension or investigation for drug offenses or intoxicated driving, involvement in crimes of violence, or other incidents involving repeated or serious breaches of discipline. Individuals should be referred for a drug test as soon as possible after the behavioral incident, but not so soon as to prevent recent use from showing up on the test (for example, about 2 to 4 hours). In addition, apathy or defective attitude, or personality change may, when examined in the context of other circumstances, lead to a reasonable suspicion of drug abuse and form the basis for command-directed drug testing.

b. *Results obtained from command-directed testing may be used to refer a member for evaluation and in administrative discharge action. Results may not be used against the member in any disciplinary action under the UCMJ,*

*nor may they be used on the issue of characterization of discharge in separation proceedings.* However, the limitations of this paragraph on the use of the results do not apply to:

(1) The introduction of evidence for impeachment or rebuttal purposes in any proceeding in which the evidence of drug abuse (or lack thereof) has been first introduced by the member.

(2) Disciplinary or other action based on independently derived evidence, including evidence of drug abuse after the member's first entry into the SART Program.

(Emphasis added.)

The plain language of the above regulation does not support appellant's argument. Its prohibitions on use of command-directed urinalysis results are specifically limited. It only precludes use of the results "in any disciplinary action under the UCMJ" or "in separation proceedings" and leaves open the possibility of their use for other law enforcement purposes. It simply does not expressly prohibit OSI or any other police authority from interviewing a servicemember who has come up positive on a command-directed analysis about the circumstances of his drug involvement. In any event, it clearly does not confer upon a servicemember *de facto* or *de jure* immunity for future drug offenses which might come to the attention of military authorities as an indirect result of an earlier command-directed urinalysis.

We also note that paragraph 5–8 of AFR 30–2 does not stand alone with respect to use of results of such a urinalysis. Paragraph 5–5 of this same regulation states:

Section C—Use of Drug Testing Results

5–5 **General Guidelines.** *Drug testing is used along with investigation and law enforcement as one countermeasure to drug abuse.* It is most effective as a deterrent only if it has the potential to reach each Air Force military member. All military personnel must recognize that they can be tested. The testing method which best achieves this deterrent goal is inspection testing.

*Commanders must have flexibility to select the most appropriate testing procedure, but inspection testing should be the predominant method used, supplemented by probable cause and commander directed tests.* Drug testing of Air Force military personnel for the purpose of detecting drug use is conducted according to AFR 160–23. *See* figure 5–1 for guidelines for use of drug testing results. Military members who fail to comply with an order to provide a urine sample under the circumstances specified below are subject to punitive action under Article 92, UCMJ for "failure to obey a lawful order." *Individuals identified as a result of drug testing must be referred for evaluation.* Military members may be ordered to provide urine samples (paragraphs 5–6 through 5–9). Military members may be asked to voluntarily consent to provide urine samples at any time. Results from a consensual test may be used to refer a member for evaluation, to support and use as evidence in a disciplinary action under the UCMJ or administrative discharge action, including the issue of service characterization in separation proceedings.

(Emphasis added.)

This section of the regulation strongly suggests that a positive result on a command-directed urinalysis was not intended to completely paralyze the command in its war against drug abuse in the military.

## II

█ The second and more difficult question raised in this case is whether the command-inspection system provided in AFR 30–2, which permits such indirect use of command-directed or compelled urinalysis results, violates the Fourth Amendment. *See United States v. Bickel,* 30 MJ 277 (CMA 1990); *cf. United States v. Bair,* 32 MJ 404, 410 (CMA), *cert. denied,* —— U.S.

——, 112 S.Ct. 438, 116 L.Ed.2d 457 (1991).[2] This question need not be decided today. *But see Skinner v. Railway Labor Executive Association,* 489 U.S. 602, 621 n. 5, 109 S.Ct. 1402, 1415 n. 5, 103 L.Ed.2d 639 (1989). Appellant's incriminating statements and his consent to a second urinalysis were voluntary acts upon which any possible taint from the earlier command-directed urinalysis had been clearly dissipated. *See generally United States v. Steward,* 31 MJ at 264 n. 4.

In reaching the above conclusion, we note that Justice Scalia, writing in *Murray v. United States,* 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2532–33, 101 L.Ed.2d 472 (1988), generally summarized the scope of the exclusionary rule as follows:

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed. 2d 734 (1961). Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). *See Wong Sun v. United States,* 371 U.S. 471, 484–485, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963).

Appellant contends that his consent to the urinalysis and to the incriminating statements given on September 14, 1989, were the product of an AFOSI interview which

---

**2.** We have approved admission of urinalysis results at courts-martial if the urine sample was seized as part of a legitimate military inspection. *See United States v. Johnston,* 24 MJ 271 (CMA 1987); *Murray v. Haldeman,* 16 MJ 74 (CMA 1983). However, we have not held that all military "inspections," regardless of their purpose, method, or use of their fruits, meet Fourth Amendment muster. *See United States v. Daskam,* 31 MJ 77, 82–83 (CMA 1990); *United States v. Johnston, supra* at 275.

in turn was "based" on the command-directed or compelled urinalysis conducted earlier in August.

■ In resolving this claim, we note that the results of appellant's August command-directed urinalysis were not proffered as evidence of his guilt of the charged September offenses. Instead, appellant seeks to suppress evidence of the charged offenses which was discovered in his interview by police only after they were informed of the earlier positive results. In this regard, we note the words of the Supreme Court in *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978):

> Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a *"per se* or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed. 2d 416 (1975).

Accordingly, to the extent that appellant's targeting argument rests solely on a "but for" analysis, we must reject his claim.

Nevertheless, appellant also suggests that his decisions to consent to a second urinalysis and to make incriminating statements were more substantially "connected" to the earlier command-directed urinalysis. He implies that his decisions to cooperate with the AFOSI were a direct product of or tainted by the earlier command-directed urinalysis. We disagree. *See United States v. Collier*, 1 MJ 358 (CMA 1976).

■ In this regard, we note that appellant was not in custody after his August urinalysis and the complained-of interview took place some 2 weeks later. He thus had ample opportunity to seek legal advice concerning the ramifications of the command-directed urinalysis. *See United States v. Schake*, 30 MJ 314, 318 (CMA 1990). Second, prior to the complained-of OSI interview, he was fully advised of his rights under Article 31, UCMJ, 10 USC § 831, and the drug crimes of which he was suspected. *See Brown v. Illinois, supra; United States v. Spaulding*, 29 MJ 156, 161 (CMA 1989). Third, during the interview, he gave his consent to providing a second urine sample prior to being informed of the results of his earlier test and without their exploitation. *Id.* Fourth, prior to actually giving his oral statements during the OSI interview, he was again advised of his rights under Article 31. *See Brown v. Illinois, supra.* Finally, although the agents eventually informed appellant that his command-directed test results were positive, he acknowledged and the agents affirmed that these results could only be used against him at administrative proceedings. In these circumstances we conclude that any taint from the command-directed urinalysis on appellant's later incriminatory actions was clearly attenuated. *Cf. United States v. Steward, supra.*

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX, CRAWFORD, and GIERKE concur.

Judge WISS and Senior Judge EVERETT did not participate.