UNITED STATES, Appellee

v.

Kelvin F. GARDNER, Sergeant First Class U.S. Army, Appellant.

No. 93–0410.
CMR No. 9101699.

U.S. Court of Military Appeals.

Argued March 1, 1994.

Decided Sept. 30, 1994.

For Appellant: *Captain Clement B. Lewis, III* (argued); *Colonel Malcolm H. Squires, Jr., Lieutenant Colonel James H. Weise, Captain Michael E. Smith* (on brief); *Colonel Stephen D. Smith* and *Major James M. Heaton.*

For Appellee: *Major Kenneth T. Grant* (argued); *Colonel Dayton M. Cramer, Major James L. Pohl, Captain Jane F. Polcen* (on brief).

*Opinion of the Court*

WISS, Judge:

Appellant was tried by a special court-martial composed of officer and enlisted members at Kaiserslautern, Germany, between April and July 1991. Contrary to his pleas, he was found guilty of dereliction of duty by willfully not providing a urine specimen, in violation of Article 92, Uniform Code of Military Justice, 10 USC §§ 892. He was sentenced to a bad-conduct discharge. On November 7, 1991, the convening authority approved the sentence as adjudged. The Court of Military Review affirmed. 36 MJ 543 (1992).

This Court granted review on the following issue:

WHETHER THE SEIZURE OF EVIDENCE FROM APPELLANT THROUGH A COMMAND–DIRECTED URINALYSIS AND THE SUBSEQUENT USE OF THAT EVIDENCE AGAINST HIM WAS UNREASONABLE AND IN VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION.

We reaffirm that it is constitutionally permissible to require servicemembers to submit to urine samples as part of an inspection. *United States v. Bickel,* 30 MJ 277, 285 (CMA 1990). We hold that this urinalysis was a valid inspection and not an impermissible pretextual search.

On July 30, 1990, Captain (CPT) Westburg, Commander of Headquarters and Headquarter's Company, 21st Theater Army Area Command (TAACOM) in Kaiserslautern, Germany, ordered a random unit urinalysis test. As appellant was assigned to this unit, he participated in this test. However, appellant did not submit a urine specimen but instead submitted a fluid specimen containing only water but no human urine. Appellant's willful failure to provide the required urine specimen resulted in the charged offense of dereliction of duty.

At trial, the defense moved to suppress the urinalysis results as the fruit of an illegal search because the entire 21st TAACOM urinalysis program was unconstitutional.[1] Appellant argued that the Army abused its once-valid urinalysis inspection scheme by converting it into a pretextual search without probable cause and a tool for uncovering criminal evidence—essentially that the Army drug urinalysis program "has gone awry." Appellant asserted that the intrusiveness of the urinalysis, both in its manner (*i.e.,* lack of privacy) and scope (*i.e.,* results used in criminal prosecutions), took the Army's procedure out of the narrow exemption from traditional Fourth Amendment restrictions that has been carved out for legitimate urinalysis inspections. Appellant claimed that this case presents the provocative situation mentioned in footnote 5 of *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 621, 109 S.Ct. 1402, 1415, 103 L.Ed.2d 639 (1989), that states: "We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the FRA

[Federal Railroad Administration]'s program."

Appellant relied on three principal matters to support the argument: first, a regulation that requires positive urinalysis test results to be reported to military law enforcement agencies: para. 4d(1), U.S. Army Europe Reg. 190–2, Military Police—USAREUR Drug Suppression Plan (20 Sep. 1991); second, CPT Westburg's written unit policy of no toleration of use of illegal drugs and promise of harsh treatment for drug offenses; and third, voluminous statistics of disciplinary action taken by various commands in the 21st TAACOM regarding positive urinalysis tests results. As explained below, a careful review of these and other relevant matters leads us to reject appellant's argument.

In *United States v. Bickel, supra,* this Court held that requiring servicemembers to submit urine samples as part of an inspection is constitutionally permissible. This Court expressly recognized the differences between drug-testing procedures in the armed services and those upheld in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives' Association, supra,* yet stated several reasons for concluding that testing of servicemembers pursuant to a Mil.R.Evid. 313, Manual for Courts–Martial, United States, 1984, inspection is constitutionally valid. 30 MJ at 282–86. We have reviewed our rationale and holding in *Bickel* and reaffirm that both remain valid. Chief Judge Everett's observation in an earlier case concisely states the position of the present unanimous Court on this issue:

> The experience of recent years makes clear that mandatory drug testing of servicemembers contributes substantially to reduction of drug use in the armed services and to making the military community drug free. In our view, compulsory urinalysis is appropriate and necessary to maintain the effectiveness of the military establishment.

1. *Cf. Unger v. Ziemniak,* 27 MJ 349 (CMA 1989) (appellant asserted that "unreasonable" urinaly-

sis seizure rendered order to provide urine specimen illegal).

*Unger v. Ziemniak,* 27 MJ 349, 357 (CMA 1989) (footnote omitted).

Although approving the urinalysis inspection in *Bickel,* this Court stated that it "might take a different view if the drug testing were designed solely to obtain evidence for criminal prosecution." 30 MJ at 285. We still need not address that situation, for the Government has established that the present urinalysis was a valid inspection and not a pretext or subterfuge for an otherwise illegal search. *Cf. United States v. Williams,* 35 MJ 323 (CMA 1992).

■ Mil.R.Evid. 313(a) states that evidence obtained during an inspection is admissible. Mil.R.Evid. 313(b) defines an "inspection" as "an examination of the whole or part of a unit ... conducted as an incident of command the primary purpose of which is to ... ensure the security, military fitness, or good order and discipline of the unit...." Mil.R.Evid.313(b) states that "[a]n order to produce ... urine, is permissible" but "[a]n examination made for the primary purpose of obtaining evidence for use in a trial ... is not an inspection...." The litmus test is whether the examination is made primarily for administrative purposes or instead for obtaining incriminating evidence. The former is admissible under the rule, while the latter is not. What the Court said in *United States v. Barnett,* 18 MJ 166, 169 (CMA 1984), regarding an inventory is equally true of an inspection: "The case law does not indicate that the results of an inventory will be inadmissible in evidence when the inventory has been performed by someone whose 'secondary purpose' was to seek evidence of crime." *See United States v. Williams,* 35 MJ 323 (CMA 1992); *United States v. Johnston,* 24 MJ 271 (CMA 1987); *Murray v. Haldeman,* 16 MJ 74 (CMA 1983).

Although the military judge's finding regarding the "primary purpose" is a matter of fact, the issue of whether the examination is an inspection is a matter of law that this Court will review *de novo. Compare United States v. Campbell,* 41 MJ 177, 181 (CMA 1994), *with United States v. Barnett, supra.*

The administrative nature of the Army urinalysis program is unquestionable.[2] Even trial defense counsel conceded that the Army urinalysis program is at least *facially* administrative in nature and that any criminal prosecution which results from urinalysis testing would appear to be merely ancillary to the inspection rationale of the urinalysis testing.

Moreover, we are not presented with the situation where appellant asserts that he was improperly targeted for urinalysis. *Cf. United States v. Campbell* and *United States v. Johnston,* both *supra.* Appellant instead asserts that his unit commander's purpose was

2. Paragraph 1–8, Army Regulation (AR) 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program (21 October 1988) notes that the objective of the Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) includes the prevention of alcohol and other drug abuse, the early identification of alcohol and drug abusers, and the earliest possible restoration of both military and civilian employees to duty. The general policy of this regulation is that drug abuse is incompatible with military service and "[a]n active and aggressive urinalysis program serves as a valuable tool and effective deterrent against drug abuse." Para. 1–9*h,* AR 600–85. With regard to urinalysis, AR 600–85 notes that the specific policy behind biochemical testing is to:

(1) Preserve the health of soldiers of the U.S. Army by identifying alcohol or drug abusers in order to provide appropriate counseling, rehabilitation, or other medical treatment.

(2) Permit commanders to assess the security, military fitness, good order, and discipline of their commands and to take appropriate action based upon such an assessment.
Para. 10–1b. The objectives of urinalyses are described in that regulation as follows:

(1) Early identification of alcohol or drug abuse.

(2) Deterrence of drug abuse.

(3) Monitoring of rehabilitation progress for those who require testing as part of their rehabilitation program.

(4) Development of data on the prevalence of alcohol and drug abuse within the Army.
Para. 10–1c. The purposes of urinalyses include determining the individual soldier's fitness for duty or medical treatment, determining the presence of controlled substances in soldiers' body fluids during rehabilitative treatment, gathering evidence to be used in administrative actions, and gathering evidence to be used in actions under the Uniform Code of Military Justice. Para. 10–2a–d.

to obtain criminal evidence. The record does not support this contention.

In February 1990, prior to the urinalysis ordered and involved here, CPT Westburg published a command alcohol and drug abuse policy that included the following statements:

1. The abuse of alcohol and use of illegal drugs will not be tolerated by this command. . . .

\* \* \*

5. Any member of this company who is involved in the use of illegal drugs will be dealt with harshly. The minimum punishment will be non-judicial under article 15 [, UCMJ, 10 USC § 815] and the maximum punishment could be separation for the service.

At trial CPT Westburg testified that the only purpose of the urinalysis program was "to deter the use of drugs." She explained that this deterrence was accomplished by each soldier's knowing that "if they come up positive on a urinalysis that some punitive action can be taken." She published her policy on drugs to make it clear to soldiers what can result from a positive urinalysis. Essentially, CPT Westburg established a command policy that each soldier would be accountable for drug abuse. This statement of command policy alone did not make the urinalysis program primarily a tool for criminal prosecution.

CPT Westburg testified that she always ordered the urinalysis for the purpose of "unit discipline, health and welfare, and as a deterrent for the use of illegal drugs." She specifically stated that, in ordering this particular urinalysis, her concerns were "good order and discipline; health, welfare, morale of the unit." She stated it was not her purpose to develop evidence to be used in a punitive or criminal proceeding and denied that she had ever ordered a urinalysis test for the sole reason of gathering evidence to use against someone.

CPT Westburg revealed that she had ordered approximately 20 random unit urinalyses that resulted in approximately 2,200 specimens being provided. Of these, only three specimens tested positive for drugs—one servicemember tested positive twice and another servicemember tested positive only once. Each individual received one Article 15 punishment, and neither was court-martialed. The soldier who twice tested positive was not punished for the second drug offense but was administratively processed for discharge.

After viewing CPT Westburg's testimony and her record of handling positive urinalyses, we uphold the military judge's factual finding that the primary purpose of this urinalysis was to protect the health of soldiers and their welfare and the readiness of the unit to accomplish its assigned mission.

Appellant's reliance on the number of Article 15 punishments following urinalyses revealing drug abuse in various commands in the 21st TAACOM to establish a pattern of prosecution is unpersuasive. Appellant's data is general, vague, incomplete, and fails to present an accurate record of positive urinalysis testing and dispositions taken. We reject appellant's argument that the large number of Article 15 punishments for drug offenses establishes that this inspection became a subterfuge. More importantly, CPT Westburg's decision not to punish but to process administratively the soldier who failed a second urinalysis test belies any assertion that the purpose of this urinalysis was other than for discipline, health, and welfare purposes and to deter illegal drug use.

Finally, the record does establish that in Europe, positive urinalysis results are reported to military law enforcement agencies. Para. 4d(1), Army Europe Reg. 190–2, Military Police—USAREUR Drug Suppression Plan (20 Sep. 1991). However, we have stated that, even though positive results of drug tests are made available to prosecutors, this requirement alone does not render the inspection an unreasonable intrusion. *See United States v. Bickel*, 30 MJ at 282 and 285.

Having scrutinized the urinalysis at issue, we conclude that appellant's prosecution was merely incidental punitive action ancillary to an otherwise justifiable inspection. Neither the command policy letter nor the routine provision of test results to law enforcement agencies destroyed the validity of the otherwise lawful urinalysis inspection.

As this was a lawful command-ordered urinalysis and inspection, evidence of appellant's substitute specimen was admissible to prove appellant's dereliction-of-duty offense.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD and GIERKE concur.

COX, Judge (concurring in part and in the result):

See my separate opinion in *United States v. Campbell,* 41 MJ 177, 187 (CMA 1994).