UNITED STATES, Appellant,

v.

Lee E. MOORE, Jr., 541 25 2822 Private (E–1) U.S. Marine Corps, Appellee.

NMCM No. 9401785.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

18 Jan. 1995.

CDR S.A. Stallings, JAGC, USN, Appellate Government Counsel.

LT D. Jacques Smith, JAGC, USNR, Appellate Defense Counsel.

McLAUGHLIN, Judge:

This is an appeal by the United States pursuant to Article 62, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 862, requesting that we reverse a ruling by the military judge suppressing the results of tests of two urine specimens taken from the appellee on 11 and 16 August 1994. We agree with the United States and hold that the military judge erred as a matter of law.

The appellee was arraigned on 6 October 1994 on charges of wrongful use of marijuana and methamphetamine in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. At an Article 39(a), UCMJ, session before entering pleas, the appellee moved to suppress the test results. After hearing testimony, the military judge suppressed the test .results and the Government filed its appeal. We find that the provisions of Rule for Courts–Martial [R.C.M.] 908(b), and this Court's rules were satisfied. Oral argument was heard on 5 January 1995.

At trial, the appellee's attack on the admissibility of the test results focussed on the Government's failure to prove, by clear and convincing evidence, that this inspection program was not primarily for the purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary procedures. Mil.R.Evid. 313(b). The need for proof "by clear and convincing evidence" arises from the appellee's premise that the purported inspection was to locate contraband from "specific individuals ... selected for examination." *Id.* Suggested in the appellee's brief, and emphasized at oral argument, is that the regimental commander ordered the company commander to have Legal Platoon, Motor Transport Platoon, and Communication Platoon inspected by urinalysis on a weekly basis, instead of what was an otherwise in-place inspection program of once or twice monthly for the entire company, *in order to obtain evidence for court-martial against the appellee,* a member of Legal Platoon.

LT S.J. Coaty, JAGC, USNR, Appellate Government Counsel.

## Background

In June 1994, the appellee had been given nonjudicial punishment [NJP] under Article 15, UCMJ, for wrongful use of methamphetamine. As a result of this NJP, the appellee became "non-deployable" and, in accordance with standard operating procedures, when his battalion deployed, he was left behind. Personnel who are non-deployable, and left behind upon deployment, are transferred to Headquarters Company [HqCo], 7th Regiment. At HqCo, these non-deployable individuals are separated into platoons according to their status or needs. There is a Medical Platoon, a platoon of members whose end of active obligated service was imminent (EAS platoon), a Witness Platoon, and a Legal Platoon. The HqCo also contained the more functional Communications Platoon, Motor Transport Platoon, Tactical Operational Weapons Platoon, and Headquarters Platoon. The appellee, due to his being processed for an administrative discharge related to his prior NJP in June, was assigned to Legal Platoon. Some dispute arises as to whether *all* members of Legal Platoon await imminent discharge or disciplinary action, but the regimental commander's testimony, repeated by others, reflects that the members of Legal Platoon were perceived to have problems with maintaining the high degree of self-discipline regarding good order and discipline and military fitness that is the hallmark of a United States Marine. Some, like the appellee, were substance-abusers, others were not. Some were being administratively processed for discharge unrelated to UCMJ violations or drug abuse. The Legal Platoon fluctuated between about 20 and 30 members during the summer of 1994.

During this summer of 1994, the commanding officer of 7th Marines perceived a high number of positive urinalysis test results from HqCo. Through the HqCo commander, he instituted a program of more frequent testing for those platoons exhibiting a high incidence of positive test results. Specifically, Legal Platoon, *Communication Platoon,* and *Motor Transport Platoon* were to be

inspected (provide urine samples) on a weekly basis. In July 1994, Communication Platoon was inspected on 5, 7, 11, 14, 18, 21, 25, and 28 July. Legal and Motor Transport Platoons were inspected 5 July only. In August 1994, Communication Platoon was inspected on 1, 8, 17, 24, and 30 August. Legal Platoon was inspected 2, 11, 16, 25, and 29 August. Motor Transport Platoon was inspected 16 and 22 August.[1]

## Law

In a Government appeal, this Court is empowered to act only with respect to matters of law. Article 62(b), UCMJ, 10 U.S.C. § 862(b); R.C.M. 908; *United States v. Postle,* 20 M.J. 632, 636 (N.M.C.M.R.1985). As a rule, we are bound by the trial judge's resolution of factual questions and will overturn such factual determinations only if we find they are unsupported by the record or are clearly erroneous. *United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985) (citing *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A.1981)). In a case attacking the primary purpose of a urinalysis testing program under Mil.R.Evid. 313(b), a military judge's finding regarding the "primary purpose" may be a matter of fact, however, "whether the examination is an inspection is a matter of law...." *United States v. Gardner,* 41 M.J. 189, 191 (C.M.A.1994) (citations omitted).

## Facts

After hearing testimony and argument, the military judge made the following mixed findings of fact, conclusions, and rulings:

1. The "Legal Platoon," of which Pvt Moore was a member in July and August 1994, is a part of HqCo, 7th Marine Regiment, 1st MarDiv, located at MCAGCC, 29 Palms, CA.

2. HqCo is made up of 5 or 6 platoons.

3. Pvt Moore joined Legal Platoon in July 1994 after his Battalion deployed.

4. The Legal Platoon is composed of individuals awaiting administrative discharge or disciplinary action of some kind.

---

1. In this regard, we note that virtually the entire company was ordered to give urine specimens on 15, 16, and 17 August 1994.

5. During the relevant period, members of Legal Platoon were required to submit to urinalysis tests once a week.

6. Comm Platoon and Motor Transport Platoon, also identified as having a history of a high incidence of drug abuse, were also required to submit to more frequent urinalysis.

7. The rest of the HqCo of the Regiment participates in urinalysis tests approximately once per month, or in some cases, twice per month.

8. All positive urinalysis results are dealt with at some form of disciplinary proceeding or administrative discharge process, unless it's inconvenient for the command, i.e., delay processing with which they choose not to interfere.

9. The stated purpose of the increased frequency of testing was to "aggressively and frequently focus on the elements having the most problems with drug abuse."

10. The real purpose behind the urinalysis tests for "problem" units was to attempt to gain evidence for disciplinary proceedings against those showing positive results.

11. The recurring theme of the rationale was "maintaining good order and discipline."

12. In the case of positive urinalysis results, "maintaining good order and discipline" means NJP, court-martial, or adverse administrative discharge proceedings will follow.

13. The members of legal platoon ordered to provide more frequent samples were, "specifically selected" for examination due to the commander's belief that they lacked self-discipline, were in the platoon for drug abuse and other misconduct, or were pending admin separation, and were therefore more likely than others to test positive for drug abuse.

14. The government has failed to show by clear and convincing evidence that these more frequent urinalyses were an inspection, as defined by MRE 313(b) and not a subterfuge to acquire evidence for use against members of the legal platoon in disciplinary or adverse administrative proceedings.

15. The urinalysis results are not admissible under any other provision of the MRE's.

16. The urinalysis results in this case, and any derivative evidence obtained therefrom, are not admissible in a trial by court-martial against Pvt Moore.

Record at 49; Appellate Ex. V.

■ The military judge held the Government to a burden of showing by "clear and convincing evidence" that the urinalysis testing was an inspection under Mil.R.Evid. 313(b) and not a quest for evidence. Record at 6, 38. The Government conceded that it carried this burden, although in later argument the Government wavered on the issue. Record at 6–7, 30. We are not convinced that the Government had such a heavy burden.

■ Mil.R.Evid. 313(b) provides that an examination made for the primary purpose of obtaining evidence for use in a trial by court-martial is not a valid inspection. The rule also provides analysis to apply to inspections that may be suspect. *United States v. Pappas*, 30 M.J. 513, 516 (A.F.C.M.R.), *petition denied*, 31 M.J. 490 (C.M.A.1990). In general, the Government must prove by a preponderance of evidence that the examination was a valid inspection, i.e., not a subterfuge to search. Suspect examinations are those whose purpose is to locate weapons or contraband. Urinalysis inspections are commonly considered suspect examinations for the purpose of further analysis to determine if the inspection program is being used as a subterfuge search. *United States v. Johnston*, 24 M.J. 271 (C.M.A.1987); *Pappas*, 30 M.J. at 515–16. If the purpose of the examination is to discover contraband *and* if "(1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subject to substantially different intrusions during the same examination," the Government's burden is to establish by clear and convincing evidence that the examination was a legitimate inspection. If none of these

three factors is present, the Government's burden is by a preponderance. Mil.R.Evid. 313(b). We find none of the three elements that would increase the Government's burden to prove the legitimacy of this urinalysis program by clear and convincing evidence.

Finding of Fact 13, indicating that members of Legal Platoon were singled out because of their perceived lack of self-discipline, is clear and proper in its logic, but it gives no support to an increased burden of proof nor to the appellee's claims.[2] Nevertheless, we will review the case as if the Government had a burden to show a proper purpose for the inspection by clear and convincing evidence. An evil to be prevented by the protections of Mil.R.Evid. 313(b) is the targeting of a unit or sub-unit for an inspection as a pretext for obtaining evidence against an individual. Record at 32; *United States v. Campbell*, 41 M.J. 177 (C.M.A.1994). At oral argument, the appellee firmly alleged that he was specifically targeted by the regimental commander to participate in the frequent urinalysis program so that evidence could be obtained against him for court-martial. This is unsupported by the record and indeed refuted by the commander's decision to increase urinalysis testing of three platoons *and* initiating the increased testing, not with the appellant's Legal Platoon, but with the Communication Platoon.[3]

### Conclusion

We find several of the military judge's findings of fact and his conclusions to be unsupported by the evidence. We also find the military judge to be in error on the law in determining that the urinalysis program under which the appellee provided his specimens was not an inspection. *Gardner*, 41 M.J. 189 (C.M.A.1994).

First, we would join our brethren in the Air Force and Army in recognizing that " 'a commander who does not recognize the possibility of disciplinary actions arising from a positive urinalysis test is either naive or engaging in deliberate ignorance.' " *United States v. Parker*, 27 M.J. 522, 527–28 (A.F.C.M.R.1988) (quoting *United States v. Rodriguez*, 23 M.J. 896, 899 n. 5 (A.C.M.R. 1987)). This recognition is not, however, determinative of the primary purpose of a urinalysis examination. The military judge found the "real" purpose of the urinalysis program at the HqCo, 7th Marines was to gain evidence for disciplinary proceedings. Finding of Fact 10. We construe "real" to mean "primary." This conclusion is not supported by the evidence. The regimental commander's stated purpose for his urinalysis program, and the more frequent testing of platoons evidencing a high or increasing incidence of positive results, was to strictly adhere to the Marine Corps policy. Record at 11. When pressed by trial counsel to "pick one purpose, what would you say your primary purpose was in instituting this frequent urinalysis policy?", the commander's response was "I'd reiterate it was the Marine Corp's policy that we would not have people using drugs." Record at 12. This is a legitimate purpose, as is deterrence. *United States v. Taylor*, 41 M.J. 168, 172 (C.M.A. 1994); *Gardner*; *Rodriguez*, 23 M.J. at 899. Subsequent witnesses, recognizing that a positive urinalysis for a person with a less than stellar record of performance could carry with it some form of adverse disciplinary proceeding, consistently testified that the primary purpose of the urinalysis program was to maintain good order and discipline, fitness, and deterrence. No contrary or impeaching evidence was introduced. Evidence was introduced to show that sometimes individuals in Legal Platoon whose urine tested positive

---

**2.** The drafter's analysis to the Manual for Courts–Martial, United States, 1984 [MCM], indicates that " '[s]pecific individuals' means persons named or identified on the basis of individual characteristics, rather than by duty assignment or membership in a subdivision of the unit ... such as a platoon or squad, or on a random basis." Mil.R.Evid. 313(b) analysis, MCM, app. 22, A22–24.

For an example of individuals "hand-picked" through the subterfuge of testing a unit or sub-

unit, *see United States v. Campbell*, 41 M.J. 177 (C.M.A.1994), and *United States v. Patterson*, 39 M.J. 678, 682–83 (N.M.C.M.R.1993).

**3.** As noted, the Communication Platoon began its more intensive urinalysis program in July 1994, specifically 5, 7, 11, 14, 18, 21, 25, and 28 July. In July, the Legal and Motor Transport Platoons were inspected on the 5th only.

for illegal drugs were further disciplined, and sometimes they were not. No evidence was introduced that Pvt Moore was a specific target of the regimental commander for the urinalyses of 11 and 16 August 1994, and the rationale for more frequent testing of several of the platoons is facially neutral, i.e., "the special interest of the military in ferreting out illegal drugs and protecting the health and fitness of its members." *United States v. Johnston*, 24 M.J. 271, 274 (C.M.A.1987) (citing *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983)).

■ The Government proved that the manner in which the urinalysis was conducted in appellee's unit met all the requirements of a lawful inspection under Mil.R.Evid. 313(b)—by a preponderance of evidence, which we find to be the burden, and also by clear and convincing evidence, the burden assumed by the military judge and advocates.

Accordingly, the ruling of the military judge, which suppressed the results of the appellee's two urinalysis tests, is reversed. The record is returned to the convening authority for action consistent with this opinion.

Chief Judge LARSON and Senior Judge WELCH concur.